1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

**COLLEGE REPUBLICANS OF THE
UNIVERSITY OF WASHINGTON;
CHEVY SWANSON**, an Individual,

                    Plaintiffs,

      vs.

**ANA MARI CAUCE**, in her official capacity
as president of the University of Washington;
**GERALD J. BALDASTY**, in his official
capacity as provost and executive vice
president; **RENE SINGLETON**, individually
and in her official capacity as assistant
director, Student Activities; **CHRISTINA
COOP**, individually and in her official
capacity as senior activities advisor, Student
Activities; **JOHN N. VINSON**, individually
and in his official capacity as Chief of the
University of Washington, Seattle, Police
Department; **CRAIG WILSON** individually
and in his official capacity as University of
Washington, Seattle, Police Department Patrol
Commander; and DOES 1-25;

                    Defendants.

NO. _____

**PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING
ORDER AND FOR ORDER TO
SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ISSUE**

Motion Date:_____

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

As set forth in detail in the Complaint, this case arises from efforts by one of Washington's leading public universities, UW Seattle, to restrict and stifle the political speech of students whose voices fall outside the campus political orthodoxy. At its core, this is a straight-forward case of state officials ratifying an unconstitutional heckler's veto. Defendants have adopted a written policy and are engaged in a pattern and practice of enforcing its policy in a manner that vests in University officials the absolute discretion to impose arbitrary and unreasonable security fees on registered student groups and has enabled Defendants to selectively apply this policy in a discriminatory fashion, resulting in a the marginalization or outright banning of the expression of conservative viewpoints on campus by any notable conservative speaker.

### STATEMENT OF RELEVENT FACTS

In January 2017, the College Republicans hosted an event featuring political provocateur Milo Yiannopolous in Kane Hall on the UW Seattle campus. Decl. Swanson, ¶ 3. The event drew significant blowback from members of the community who contacted the University hoping to have the event cancelled. *Id*.

Chevy Swanson was event coordinator for the College Republicans and directly involved in planning for the Yiannopolous event. *Id.*, ¶ 4. Swanson and other club members met multiple times with campus administration. *Id*. Initially, the administration estimated security, building rental, equipment and staffing would cost the group $1,000. *Id*. In subsequent meetings, the College Republicans were given a revised estimate of $5,000 and $7,000. *Id*. At no time did the administration officials explain the rising cost estimates except

to say that because they were expecting heightened protests, the cost of security would increase to cover additional officers. *Id.*

On January 20, 2017, the night of the Yiannopolous event, approximately 400 people gathered in Red Square to cue up for the event. *Id.*, ¶ 5. At around 5 p.m., a number of black-clad protesters wearing masks carrying sticks and flagpoles showed up breaking bricks, attempting to bust down barricades and harassing people. *Id.*

At approximately 7 p.m. an altercation occurred in which a protester was shot. Two people were later charged with assaulting the protester. *Id.*, ¶ 6. As a result of the Yiannopolous event requiring substantial security, UW Seattle adopted a "Safety and Security Protocols for Events" policy ("security fee policy"). *Id.* The policy states in relevant part:

> When the use of campus facilities involves events, activities, and programs that are likely to significantly affect campus safety, security, and operation, the University will perform an analysis of all event factors. This could result in additional conditions and requirements placed on the host organization in order to maintain the safety and security of all organizing parties, guests attending, and the broader campus community. Safety and security concerns may include, but are not limited to, history or examples of violence, bodily harm, property damage, significant disruption of campus operations, and those actions prohibited by the campus code of conduct and state and federal law.

> During the planning process, host organizations or groups are responsible for making the University aware of any known histories and/or issues of safety and security concerns. The University (i.e., venue coordinator and UWPD) may review all event details and logistics to determine necessary safety and security protocols. Additionally, if previously unknown or new safety and security concerns arise during the planning process, the University will review the event details and may alter any conditions and requirements. Any determination by authorized campus officials

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

will be based on an assessment of credible information other than the content or viewpoints anticipated to be expressed during the event. Other events taking place on or near campus will be taken into consideration in the security review. Required security measures may include, but are not limited to, adjusting the venue, date, and timing of the event; providing additional law enforcement; imposing access controls or security checkpoints limiting costumes or items carried; and/or creating buffer zones around the venue.

The host organization or group will be required to pay costs of reasonable event security as determined in advance by the University. These costs include, but are not limited to security personnel, costs to secure the venue from damage, and special equipment as determined by law enforcement. Security fees will be based on standard and approved recharge rates for UWPD, other security personnel, and associated equipment costs or rentals. Should the University place supplementary security protocols prior to or during the event to provide adequate security to help mitigate any originally unforeseen security concerns, additional security fees may be charged to host organizations or groups. Host organizations are financially responsible for damage, inside or outside of the venue, caused by members of their organization or their invitees.

The University reserves the right, in rare circumstances, to cancel an event if based on information available it is reasonably believed that there is a credible threat which unreasonably places the campus community at risk of harm.

*Id.*

The College Republicans raised money to cover the security fees through a gofundme campaign. *Id.*, ¶ 7. After the event, the College Republicans received an invoice from the University for $9,121, which they paid from the money received through the gofundme campaign. *Id.* However, the College Republicans did not plan other events in 2017 due to their inability to cover the exorbitant security costs they expected to be assessed. *Id.*

In October 2017, Kyle Broussard, an individual associated with a group called Patriot Prayer, contacted Swanson offering to have the group's founder and leader, Joey Gibson, come to the campus on November 22, 2017, for an indoor speaking event. *Id.*, ¶ 8. Patriot Prayer is an informal group of evangelical Christians formed and led by Gibson to convey a message of peace. Its Facebook page says it is about "using the power of love and prayer to fight the corruption both in the government and citizen levels that seek to gain power through division and deception."[1] *Id.* Despite this description, Gibson has been the target of physical assault by Antifa and similar violent activist groups who label him a white supremacist and Nazi. *Id.*

In October 2017, Swanson, along with other members of the College Republicans, met with Defendant Renee Singleton, assistant director of Student Activities, and Christina Coop, senior activities advisor for Student Activities, to discuss planning for the Patriot Prayer event. *Id.*, ¶ 9. Defendant Singleton told Swanson that security costs would be high due to security concerns. *Id.* Singleton also told Swanson that Patriot Prayer is a controversial group and would present major security problems. *Id.* Based on those representations, the College Republicans decided not to move forward with the event. *Id.*

In January 2018, the College Republicans discussed holding a Patriot Prayer event outdoors to defray the costs associated with room, equipment and some of the security costs. *Id.*, ¶ 10. The group reached out to Gibson to inquire about scheduling an outdoor event in February 2018. *Id.*

---

[1] https://www.facebook.com/pg/PatriotPrayerUSA/about/?ref=page_internal.

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

Swanson met again with campus advisors to discuss planning for a February outdoor event. *Id.*, ¶ 11. On February 1, 2018, Defendant Craig Wilson, Patrol Commander with the UW Seattle Police Department, told Swanson the cost of security would be $17,000 due to expected violent protests. *Id.* Wilson did not explicitly detail the reasons for such a large security fee. *Id.* No other group has been charged such an excessively large security fee in the past. *Id.*, Exh. 1, UWPD Security Costs for 2016-17, obtained through a Washington State Public Records Request.

## LEGAL STANDARD

A temporary restraining order preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary injunction application. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). A temporary restraining order may be issued without providing the opposing party an opportunity to be heard where "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

The standards for issuing a temporary restraining order and a preliminary injunction are the same. *See e.g., Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The Ninth Circuit has established two sets of criteria for evaluating a request for injunctive relief. *Earth Island Inst. v. United States Forest Serv.*,

351 F.3d 1291, 1297 (9th Cir. 2003). "Under the 'traditional' criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a temporary restraining order or preliminary injunction may be appropriate when a movant raises "serious questions going to the merits" and the "balance of hardships tips sharply in the plaintiff's favor," provided that the plaintiff is able to show there is a likelihood of irreparable injury and that the injunction is in the public interest. *Alliance for Wild Rockies v.* Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).[2]

"The denial of First Amendment freedoms generally constitutes irreparable harm, and that harm is exacerbated where a plaintiff seeks to engage in political speech." *Firearms Policy Coalition Second Amendment Defense Committee v. Harris,* 192 F.Supp.3d 1120 (June 22, 2016); *see also Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir.2009). "In a case like the one at bar, where the First Amendment is implicated, the Supreme Court has made clear that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." *College Republicans at San Francisco*

---

[2] As Plaintiffs are simply attempting to preserve the *status quo* by ensuring that Defendants apply their security policy in a manner that does not infringe upon Plaintiffs' constitutionally protected speech and assembly rights, a general preliminary injunction standard, and not a heightened mandatory injunction standard, applies. Even should a heightened standard apply, injunctive relief is appropriate in this case as "the facts and law clearly favor [Plaintiffs]," and "extreme or very serious damage will result" should injunctive relief not be granted. *Anderson v. U.S.,* 612 F.2d 1112 (9th Cir. 1979) (internal citations omitted).

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

*State University v. Reed,* 523 F.Supp.2d 1005, 1011 (N.D. Cal. 2007) (citing *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973-74 (9th Cir. 2002)), *in turn citing Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also S.O.C., Inc. v. Cnty. of Clark,* 152 F.3d 1136, 1148 (9th Cir. 1998) (holding that a civil liberties organization that had demonstrated probable success on the merits of its First Amendment overbreadth claim had thereby also demonstrated irreparable harm). "In other words, the requirement that a party who is seeking a preliminary injunction show 'irreparable injury' is deemed fully satisfied if the party shows that, without the injunction, First Amendment freedoms would be lost, even for a short period." *Reed,* 523 F.Supp.2d at 1011.

In First Amendment cases, "the 'balancing of the hardships' factor also tends to turn on whether the challengers can show that the regulations they attack are substantially overbroad." *Reed*, 523 F.Supp.2d at 1101. Similarly, the requirement that issuance of a preliminary injunction be in the "public interest" usually is deemed satisfied when it is clear that core constitutional rights would remain in jeopardy unless the court intervened. *Id.*

## ARGUMENT

## PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

### A. Plaintiffs' Likelihood of Success is Strong on Multiple Constitutional Grounds

Plaintiffs bring causes of action under 42 U.S.C. § 1983 ("Section 1983"). A Section 1983 claim must allege facts demonstrating that the plaintiff was deprived of rights, privileges or immunities under the Constitution by a person acting under color of law.

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

*Butler v. Elle,* 281 F.3d 1014, 1021 (9th Cir. 2002). Plaintiffs are likely to succeed on the merits of this case because Defendants' security fee policy is facially and as-applied invalid under the First and Fourteenth Amendments to the U.S. Constitution.

**B. UW Seattle's First and Fourteenth Amendment Violations**

Freedom of expression must be jealously guarded, including – and particularly – when the controversial or unpopular nature of a speaker's message has stirred emotions and triggered an attempt to suppress that message. *See Gregory v. City of Chicago*, 394 U.S. 111 (1969). The true test of the right to free speech is the protection afforded to unpopular, unpleasant, disturbing, or even despised speech. *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 773-74 (1994) (pro-life expression); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (cross-burning); *United States v. Eichman*, 496 U.S. 310 (1990) (flag burning). These constitutional principles apply with equal force to the campuses of public universities, which the Supreme Court regards as the "market place of ideas," and has stated that "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)); *see also Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981); *see also Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("the mere dissemination of ideas – no matter how offensive to good taste – on a state university campus may not be shut off in the name alone of 'conventions of decency.'").

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

Government entities establish limited public forums by "opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Science v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010) (quotations and citations omitted); *see also Good News Club v. Milford Central School*, 454 U.S. 263 (1981). In such a forum, "a governmental entity may impose restrictions on speech that are *reasonable* and *viewpoint-neutral*." *Christian Legal Science*, 130 S. Ct. at 2984 n.11 (quotations and citations omitted; emphasis added). Here, Red Square constitutes, at a minimum, a limited public forum for the purposes of any analysis under the First Amendment. *Id.* at 2986 ("[W]e are persuaded that our limited-public-forum precedents adequately respect both [Christian Legal Science's] speech and expressive-association rights, and fairly balance those rights against [University of California,] Hastings' interests as property owner and educational institution.").

According to extensive legal precedent that is well-settled, Defendants may not adopt policies that regulate expression on the basis of the right holder's viewpoint, or that are unreasonable. Unfortunately, that is precisely what Defendants have done by enacting and enforcing the security fee policy, which is facially invalid due to the fact that it is vague and contains no objective criteria, factors, or standards to guide University administrators when establishing the fee amount to assess registered student organizations when applying for use of campus venues to exercise their constitutionally protected freedom of speech and assembly.

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

By requiring Plaintiffs to pay security fees based on the potential reaction of those opposed to the viewpoints expressed, the University is exercising unbridled discretion inherent in its security fee policy to impose an unconstitutional heckler's veto. In the seminal case of *Forsyth County v. Nationalist Movement*, the Supreme Court held that when public authorities impose a fee for speaking based on the estimated costs of security, it runs afoul of the First Amendment. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("[l]isteners' reaction to speech is not a content-neutral regulation. [citations omitted]. Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."). According to the Court, "[a] government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." Because the "decision [of] how much to charge for police protection . . . or even whether to charge at all" was "left to the whim of the administrator," without any consideration of "objective factors" or any requirement for "explanation," the ordinance was an unconstitutional prior restraint on speech.

UW Seattle's security fee policy and its practice of applying it in its sole discretion, like the ordinance in *Forsyth County*, vest campus administrators with unbridled discretion to charge student groups security fees for their events. The policy does not provide administrators with any meaningful guidance when deciding whether to assess security fees or any justification for charging the fees to registered student

organizations like the Plaintiffs. The University's application of its policy also demonstrates its unbridled discretion in applying its security fees policies.

Not only does the lack of specific criteria for the security fee policy and procedures permit administrators to charge fees based on the content and viewpoint being expressed, but it also allows the assessment of fees based on the potential negative reactions of listeners, both issues that led the Supreme Court to declare unconstitutional the permit policy in *Forsyth County*. "Listeners' reaction to speech is not a content-neutral basis for regulation." The University's policy and practice therefor violates the First Amendment rights of Plaintiffs and all students on campus.

In levying this additional charge, UW Seattle is requiring a registered student organization to provide funding for extra security because of the perceived controversial content of the presentation and the potentially hostile reaction of audience members. However, any requirement that student organizations hosting controversial events pay for extra security is unconstitutional because it affixes a price tag to events on the basis of their expressive content. It is, in effect, a tax on protected speech.

In the interest of preserving content neutrality when determining fees for campus events, UW Seattle cannot and must not force student groups to pay more money for security protection because an event deals with perceived controversial subjects or features controversial speakers, or because others in the community might feel offended by an event and subsequently become violent. UW Seattle' policies or practices

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

regarding security for events do not supersede students' and student organizations' First Amendment rights.

Moreover, by holding student organizations that host expressive events financially responsible for possible disruptive activity resulting from the controversial character of their events, UW Seattle grants a "heckler's veto" to the most disruptive members of the university community. Individuals wishing to silence speech with which they disagree merely have to threaten to protest and student groups not able to furnish adequate funds for security will be forced to cancel their events. In such a situation, disruptive heckling triumphs over responsible expressive activity. This is an unacceptable result in a free society and is especially lamentable on a college or university campus. Controversial speech cannot be unduly burdened simply because it is controversial.

The First Amendment's guarantees of freedom of expression and association fully extend to public universities like UW Seattle. *See, e.g., Keyishian v. Board of Regents*, 385 U.S. 589, 605-06 (1967) ("[W]e have recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment"); *Healy v. James*, 408 U.S. 169, 180 (1972) (citation omitted) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools'"); *Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981) ("With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities").

If the charge for extra security for the Plaintiffs' event is permitted to stand, it not only will be unconstitutional but also will almost certainly be in violation of the group's right to legal equality. Plaintiffs' members have reported that other, similar events on campus have not included any security at all, including a recent rally by the Industrial Workers of the World. And Defendant Vinson admitted in a recent radio interview that security fees for left-wing speakers are much lower than for conservative speakers because left-wing speakers do not have to fear being confronted with protests by conservative agitators. Decl. Becker. UW Seattle simply cannot justify why it charges some organizations either less than politically conservative groups or nothing at all.

Moreover, it is likely that many events held on the day (Saturday) and times (afternoon) similar to that of the Plaintiffs' scheduled event in Red Square itself also have had no security officers present. Thus, it is very unlikely that UW Seattle can demonstrate that the security costs demanded of the Plaintiffs are ordinary rather than extraordinary. Singling out Plaintiffs' event for special treatment holds the group to a clear and unconstitutional double standard.

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

The security fee policy impermissibly gives Defendants unfettered discretion in approving speakers proposed by the student groups, thus giving Defendants the power to regulate speakers by their content. "[A] law cannot condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials." *Citizens for Free Speech, LLC v. County of Alameda,* 62 F.Supp.3d 1129 (NDCA 2014), *citing Gaudiya Vaishnava Soc'y v. City and Cnty. of San Francisco,* 952 F.2d 1059, 1065 (9th Cir.1990) (*in turn citing City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 755, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)); *Young v. City of Simi Valley,* 216 F.3d 807, 819 (9th Cir.2000) ("When an approval process lacks procedural safeguards or is completely discretionary, there is a danger that protected speech will be suppressed impermissibly because of the government official's ... distaste for the content of the speech."). Given its vagueness, the security fee policy allows Defendants to arbitrarily and discriminatorily regulate student expression, without providing the students a reasonable  opportunity to understand and determine what protected speech will be allowed and what protected speech will be banned. As such, the security fee policy is facially invalid and unconstitutional.

The policy is also invalid as applied to Defendants, who have been burdened with such significant requirements and constraints so as to effectively deprive them of the opportunity to host their selected speaker, while in the meantime, UW Seattle has hosted numerous non-conservative speakers at central locations on campus. The

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

unwritten security fee policy, as applied by Defendants, has deprived and continues to deprive Plaintiffs of their rights without due process.

For similar reasons, Defendants' conduct has violated Plaintiffs' equal protection rights. "The first step in equal protection analysis is to identify the [defendants'] classification of groups." *Country Classic Dairies, Inc. v. State of Montana, Dep't of Commerce Milk Control Bureau,* 847 F.2d 593, 596 (9th Cir. 1988). To accomplish this, a plaintiff may show that the law is applied in a discriminatory manner or imposes different burdens on different classes of people. *Christy v. Hodel,* 857 F.2d 1324, 1331 (9th Cir. 1988). Here, Defendants clearly classify students and student organizations into conservative and non-conservative groups, and treat them differently based on the hostile reactions of non-conservative groups to conservative speakers and the absence of any form of hostile reaction by conservative groups to non-conservative speakers.

"The next step ... [is] to determine the level of scrutiny." *Country Classic Dairies,* 847 F.2d at 596. Given that Defendants' conduct violates Plaintiffs' fundamental right of free speech, Plaintiffs are entitled to the benefit of strict scrutiny, and "[a] classification that impinges upon a fundamental right must be 'precisely tailored to serve a compelling governmental interest.'" *Sanchez v. City of Fresno,* 914 F.Supp.2d 1079, 1109 (E.D. Cal. 2012); *citing Plyer v. Doe,* 457 U.S. 202, 217 (1982). Under this requirement, regulations cannot "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). A restriction is "narrowly tailored" only if it eliminates no more evil than it seeks to

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

remedy. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Further, "the First Amendment demands that municipalities provide 'tangible evidence' that speech-restrictive regulations are 'necessary' to advance the proffered interest…" *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001) (citation omitted).

Here, the security fee policy and its disparate application to Plaintiffs was and is not narrowly tailored to serve a compelling governmental interest. Indeed, Defendants have never articulated exactly what factors, conditions or standards are taken into account when setting its security fees for student facility use (if a compelling government interest exists, it only exists whenever hostile actors threaten a breach of security due to viewpoints they wish to suppress). While UW Seattle has an interest in maintaining a safe campus, strapping student groups with a prohibitively excessive price tag on security, and only with respect to speakers hosted by conservative students and student organizations, is not narrowly tailored to UW Seattle's interests. UW Seattle's policy has been and is being applied to discriminate intentionally and unequally against Plaintiffs and students with conservative perspectives – while allowing students who champion non-conservative speakers the opportunity to enjoy on-campus presentations at central locations and opportune times. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1069 (9th Cir. 2012) (finding violation of free speech, due process, and equal protection for university's application of unwritten policy). The disparate treatment of Plaintiffs as compared to similarly situated students and student

PLTS' MEMO. OF POINTS & AUTH'IES -
CASE NO.

Page - 17

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

organizations based on UW Seattle's security fee policy and practices has burdened Plaintiffs' fundamental right, and constitutes a violation of equal protection.

**C. UW Seattle Has Retaliated Against Plaintiffs On the Basis of their Exercise of their Free Speech Rights**

The First Amendment forbids government officials from retaliating against individuals for speaking out. *Blair v. Bethel School Dist.,* 608 F.3d 540, 543 (9th Cir. 2010); *Hartman v. Moore,* 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L.Ed.2d 441 (2006); *see also Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir. 1986). To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *See Blair*, 608 F.3d at 543; *Pinard v. Clatskanie School Dist. 6J,* 467 F.3d 755, 770 (9th Cir. 2006). The "retaliation" perhaps implies ill will, but by definition, no such state of mind requirement forms part of the elements of the cause of action.

When Plaintiffs attempted to secure the appearance of Gibson as an on-campus political speaker, it was clearly engaging in constitutionally protected activity. UW Seattle's decision to impose a draconian and prohibitively hefty security fee on Plaintiffs cannot be explained by objective criteria but by the ideological nature of Gibson's message and the hostility shown towards it by non-conservative groups. As such, Plaintiffs are likely to prevail on their free speech retaliation claim.

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

### D. Plaintiffs Are Likely to Be Harmed Irreparably Absent Immediate Injunctive Relief

"[P]urposeful unconstitutional suppression of speech constitutes irreparable harm for preliminary injunction purposes." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1192 (E.D. Cal. 2015), aff'd, 637 F. App'x 401 (9th Cir. 2016) (citing *Goldie's* Bookstore v. Superior Ct., 739 F.2d 466, 472 (9th Cir.1984)). As stated above, the requirement that a party who is seeking a preliminary injunction show 'irreparable injury' is deemed fully satisfied if the party shows that, without the injunction, First Amendment freedoms would be lost, even for a short period. *Reed*, 523 F.Supp.2d at 1011. Without an injunction preventing Defendants from assessing an exorbitantly excessive security fee from Plaintiffs irreparable harm in the form of deprivation of First Amendment freedoms will befall Plaintiffs and all other UW Seattle students who wish to hear Gibson speak. As explained in the Complaint, Defendants' discriminatory tax on Plaintiffs' freedom of expression, association and assembly is not acceptable, as it renders it impossible for Plaintiffs to hold its proposed rally. *See, e.g., S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148 (9th Cir. 1998) (holding that a civil liberties organization that had demonstrated probable success on the merits of its First Amendment overbreadth claim had thereby also demonstrated irreparable harm). Additionally, Defendants are unlikely to reverse their decision to impose such a large security fee even if the event were to be rescheduled.

Plaintiffs' irreparable First Amendment injuries cannot adequately be compensated by damages or any other remedy available at law. "Unlike a monetary

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

injury, violations of the First Amendment 'cannot be adequately remedied through damages.'" *Americans for Prosperity Foundation v. Harris,* 182 F.Supp.3d 1049, 1058 (CDCA 2016); *citing Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138 (9th Cir. 2009). Irreparable injury is clearly shown, necessitating the relief plaintiffs seek in this motion.

### E.   The Balance of Hardships Tips Decidedly in Plaintiffs' Favor

Given Plaintiffs' showing of the facially and as-applied invalidity of the vague security fee policy, Plaintiffs necessarily have shown that leaving that policy in place "would substantially chill the exercise of fragile and constitutionally fundamental rights," and thereby constitute an intolerable hardship to Plaintiffs. *Reed*, 523 F.Supp.2d at 1101. As mentioned above, Defendants' assessment of such a draconian and prohibitively excessive security fee will deprive Plaintiffs of their freedom of expression, assembly and association and will deny students an opportunity to hear from a gifted speaker whose message resonates with many students. By contrast, temporarily enjoining Defendants' enforcement of this policy to arbitrarily assess a draconian and prohibitively excessive security fee will not result in hardship to Defendants, who are in a position to adopt, at least on an interim basis, a more narrowly crafted set of equally applied provisions that enable UW Seattle to achieve any legitimate ends without unjustifiably invading First Amendment freedoms. *See id.*  In addition, Defendants will suffer no legitimate harm by accommodating a speaking event that UW Seattle has provisionally agreed to host, and that is of a type that UW Seattle consistently accommodates with respect to non-conservative speakers and student groups. Indeed,

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

UW Seattle allowed an off-campus group – the International Workers of the World – to use Red Square on a Saturday with no security costs assessed against them. Defendants will suffer no harm by providing Plaintiffs with the same opportunity to host their speakers of choice, as the opportunities routinely afforded by Defendants to non-conservative students and student groups. The Constitution demands no less.

### F. Injunctive Relief is in the Public Interest

"As the Ninth Circuit has consistently recognized, there is a significant public interest in upholding First Amendment principles." *Americans for Prosperity Foundation v. Harris*, 182 F.Supp.3d 1049, 1059 (CDCA 2016) (internal citations omitted); *see also Doe v. Harris*, 772 F.3d 563, 683 (9th Cir.2014); *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 974 (9th Cir.2002). As such, in First Amendment cases, the requirement that issuance of a preliminary injunction be in the "public interest" usually is deemed satisfied when it is clear that core constitutional rights would remain in jeopardy unless the court intervened. *Reed*, 523 F. Supp. 2d at 1101. The public is best served by preserving the foundation of American democracy via informed public discourse. *See Sammartano*, 303 F.3d at 974 ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."). As discussed above, Plaintiffs' core constitutional rights of free speech, due process, equal protection, and the right to be free from free speech retaliation, will remain in jeopardy so long as Defendants remain free to apply their High-Profile Speaker Policy to cancel the Coulter Event as scheduled for April 27, 2017.

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

**THE COURT SHOULD DISPENSE WITH ANY BOND REQUIREMENT**

Rule 65(c) of the Federal Rules of Civil Procedure provides that a TRO or preliminary injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, the Court has discretion as to whether any security is required and, if so, the amount thereof. See e.g., Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003).

Plaintiffs request that the Court waive any bond requirement, because enjoining Defendants from unconstitutionally enforcing its vague security fee policy to effectively prohibit Plaintiffs' event from taking place will not financially affect Defendants, who routinely accommodate non-conservative speakers at similar on-campus events. A bond would, however, be burdensome on already burdened Plaintiffs under these circumstances. See, e.g., Bible Club v. Placentia-Yorba Linda School Dist., 573 F.Supp.2d 1291, FN 6 (waiving requirement of student group to post a bond where case involved "the probable violation of [the club's] First Amendment rights" and minimal damages to the District of issuing injunction); citing Doctor John's, Inc. v. Sioux City, 305 F.Supp.2d 1022, 1043-44 (N.D.Iowa 2004) ("requiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay.").

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

1

## CONCLUSION

2

3         Plaintiffs respectfully request that the Court grant Plaintiffs' motion for a

4   temporary restraining order, and issue an order to show cause why a preliminary

5   injunction should not be issued to prevent Defendants from further violating Plaintiffs'

6   constitutional rights, pending trial on the merits of Plaintiffs' claims

7

8         DATED this February 6, 2018

9                                          ELLIS, LI & McKINSTRY PLLC

10                                         *s/ Kyle D. Netterfield*
                                          _____
11                                        Kyle D. Netterfield WSBA No. 27101
                                          Ellis, Li & McKinstry PLLC
12                                        2025 First Avenue PHA
                                          Seattle, WA  98121
13                                        Telephone: (206) 682-0565
                                          Fax: (206) 625-1052
14                                        Email:  knetterfield@elmlaw.com

15                                        Attorneys for Plaintiffs, College
16                                        Republicans of the University of
                                          Washington and Chevy Swanson
17

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24

25

26

27

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328

1

FREEDOM X

2

*s/*
     _____

3

William J. Becker, Jr., ESQ. SBN No. 134545

4

(Pro Hac Vice Application Pending)
Freedom X

5

11500 Olympic Blvd., Suite 400

6

Los Angeles, CA  90064
Telephone:  (310)636-1018

7

Fax: (310) 765-6328
Email: bill@freedomxlaw.com

8

9

Attorneys for Plaintiffs, College
Republicans of the University of

10

Washington and Chevy Swanson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

FREEDOM X
11500 Olympic Blvd Suite 400
Los Angeles, CA  90064
310-765-6328  Fax: 310-765-6328