1

2

Honorable Marsha J. Pechman

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11  **COLLEGE REPUBLICANS OF THE**
    **UNIVERSITY OF WASHINGTON**; and
12  **CHEVY SWANSON**, an Individual,

No. 2:18-cv-00189-MJP

13                                    Plaintiffs,

v.

14

UNIVERSITY OF WASHINGTON'S
OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER

15  **ANA MARI CAUCE**, in her official capacity
    as president of the University of
16  Washington; **GERALD J. BALDASTY**, in
    his official capacity as provost and executive
17  vice president; **RENE SINGLETON**,
    individually and in her official capacity as
18  assistant director, Student Activities;
    **CHRISTINA COOP**, individually and in
19  her official capacity as senior activities
    advisor, Student Activities; **JOHN N.**
20  **VINSON**, individually and in his official
    capacity as Chief of the University of
21  Washington, Seattle, Police Department;
    **CRAIG WILSON** individually and in his
22  official capacity as University of Washington,
    Seattle, Police Department
23  Patrol Commander; and DOES 1-25;

24

                                    Defendants.

25

26

27

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO
No. 2:18-cv-00189-MJP
    10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

# I.  INTRODUCTION

The University of Washington (the "University") applied its written protocol and analyzed appropriate objective information about the security and safety risks associated with Plaintiff College Republicans at the University of Washington's (the "College Republicans'") planned Patriot Prayer rally, determined an enhanced University police presence was necessary, and calculated a security fee based on the enhanced costs.  The event is planned for the Red Square on the University's Seattle campus, an undisputed limited public forum.  Assessing the security fee on the College Republicans in conjunction with this student hosted, on-campus event is both reasonable and viewpoint-neutral and therefore constitutional.  Especially considering that the University has not prevented the Patriot Prayer rally from occurring this Saturday regardless of whether the security fee is paid in advance, the College Republicans cannot show entitlement to a TRO.

The University, like public universities across the nation, faces unprecedented challenges in honoring free speech while ensuring safety and security at campus events and applying limited public funds to carry out the University's educational mission.  These competing interests came to a head last year when the College Republicans hosted a talk on campus by self-described provocateur Milo Yiannopoulos.  Despite significant expenditures for security, violence erupted. One person was shot and critically wounded, and several others were injured.

In the wake of this violence, the University memorialized Protocols applicable to campus groups that want to host events that have the potential to disrupt safety and security.  The Protocols set forth criteria to be evaluated in considering whether enhanced security is necessary to ensure the safety and security of speakers and the campus groups hosting an event.  If enhanced security is necessary, the hosting campus group is assessed a security fee reflecting the

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 1
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

additional cost.  Applying these Protocols, University law enforcement determined that enhanced security measures were appropriate for the College Republicans' Patriot Prayer event.  The cost of enhanced University police presence was estimated to be $17,000.  The College Republicans will be invoiced after the event on Saturday.  There is no requirement that any security fee be paid in advance as a condition for the event.

The College Republicans challenge the constitutionality of the security fee and here seek a TRO.  But the College Republicans cannot meet any of the requirements for a TRO.  First, the College Republicans seek a mandatory injunction but cannot meet the heightened standard for such relief.  Second, the College Republicans cannot demonstrate irreparable injury.  The Patriot Prayer event can proceed regardless of whether the security fee is paid in advance.  A TRO is not necessary to prevent to the loss of any speech rights.  The College Republicans' challenge to the fee can proceed after the event with the benefit of full briefing and an evidentiary hearing if necessary.  Third, the College Republicans are not likely to succeed on the merits.  The University campus is a limited public forum so that regulations such as the security fee at issue need only be reasonable and view-point neutral.  Contrary to the College Republicans' suggestion, legitimate concerns about safety associated with speech in a limited public forum can be taken into account in permitting decisions as long as the University does not favor any particular viewpoint.  There is no evidence of any such favoritism.  Fourth, the equities and public interest favor denying a TRO.  On the one hand, the University has a strong public interest in safety on its campus for the benefit of the campus group hosting the event, the speaker, and the broader campus community.  On the other hand, denying a TRO will not result in any infringement of speech.

Accordingly, the College Republicans' request for a TRO should be denied.

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 2
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

## II.  STATEMENT OF FACTS

### A.      State Regulations and the University's Protocols

The University is a public educational institution charged by the state with carrying out a "broad mission of teaching, research and public service."  Wash. Admin. Code § 478-136-010; Declaration of Denzil J. Suite ("Suite Decl."), Ex. 1.  As part of that mission, the University allows campus organizations to host non-university speakers on campus.  *Id.*  State regulations require, however, that events "comply with all applicable university policies, procedures, rules, and regulations . . . ."  *Id.*  And while the University may allow use of its facilities "for a variety of activities," such use still must serve "the primary function" of "education[]."  *Id.*  Accordingly, "[r]easonable time, place, and manner restrictions may be placed on the use of university facilities."  *Id.*

Pursuant to these state regulations, the University developed and follows a set of policies governing student organization's hosting of speakers unaffiliated with the University.  Under Executive Order No. 23 ("EO 23"), the University's Office of Special Programs administers the approval process for such events.  *Id.*, ¶ 3, Ex. 3.  Student organizations wishing to host outside speakers submit to that office basic information about the event, including its proposed date, time, place, as well as biographical information about the speaker and topics to be discussed.  *Id.*, Ex. 3.  In all cases, the University President is empowered to "prescribe, where necessary, special conditions for the conduct of particular meetings."  *Id.*

When proposed events are "likely to significantly affect campus safety, security, and operation," the University analyzes "all event details and logistics" according to policies and procedures memorialized in the Safety and Security Protocols (the "Protocols").  *Id.*, Ex. 4.  Appropriate conditions and restrictions may be placed on the event to "maintain the safety and

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 3
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

security" of event participants and the broader campus community. *Id*. The Protocols identify the details to be analyzed, including "[past] violence, bodily harm, property damage, significant disruption of campus operations," and violations of the University code of conduct or state or federal laws. *Id*. The Protocols expressly prohibit making determinations based on the "content or viewpoints anticipated to be expressed during the event." *Id*.

When proposed events present legitimate risks to safety or campus operations, the University may administer enhanced security measures, including providing "additional law enforcement; imposing access controls or security checkpoints . . . or [establishing] buffer zones around the venue." *Id*. University funding to cover such security is limited, however. Declaration of John N. Vinson ("Vinson Decl."), ¶ 17. Accordingly, the Protocols provide that "host organization[s] or group[s] will be required to pay costs of reasonable event security as determined in advance by the University," which can include "security personnel, costs to secure the venue from damage, and special equipment as determined by law enforcement." Suite Decl., Ex. 1. These fees are based on "standard and approved recharge rates for [University of Washington Police Department ("UWPD")], other security personnel, and associated equipment costs or rentals." *Id*. The University provides hosts with an estimate of anticipated security fees during the planning process. Suite Decl., ¶ 4. After the event, the University calculates and assesses total fees owed by the host group. *Id.*, ¶ 5.

**B.     The University's Enforcement of the Protocols**

Consistent with these policies, the University has provided heightened security for events hosted by campus groups that pose a substantial safety risk and then has invoiced the groups for additional security costs. Wilson Decl., ¶¶ 5-11. One such event was sponsored by the College Republicans in January 2017. Vinson Decl., ¶ 7. The event featured self-proclaimed

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 4
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

provocateur, Milo Yiannopoulos, as a keynote speaker. *Id.*; Dkt. 2-3, ¶ 3.  As part of the regular

security preparation process, UWPD provided an estimate for enhanced security costs at the

event.  Vinson Decl., ¶ 7.  The University ultimately spent about $45,000, in addition to even

larger expenditures by the Seattle Police Department.  *Id.*, ¶ 8.

Despite this enhanced security by UWPD and local and state law enforcement, protests

turned violent:  one person was shot and critically injured while many others were assaulted and

wounded.  *See id.*; Dkt. 2-3, ¶¶ 5-6.  After the event, the University invoiced the College

Republicans $9,120 for security costs.  Vinson Decl., ¶ 9.  The costs included security provided

for Kane Hall, where the event was hosted, but not for crowds that had gathered outside of Kane

Hall.  *Id*.  The College Republicans paid the invoice.  Dkt. 2-3, ¶ 6.

## C.    The Patriot Prayer Event at Issue

In January 2018, the University learned that the College Republicans had invited a group

called Patriot Prayer for a February 10, 2018 rally on campus.  Vinson Decl., ¶ 10.  The proposed

keynote speaker, Joey Gibson, founded Patriot Prayer.  Dkt. 1-1, ¶ 8.  Gibson has been

previously assaulted at multiple rallies and received several deaths threats.  Vinson Decl., ¶ 12.

For instance, Gibson was pepper sprayed at an Olympia, Washington rally on January 27, 2018,

and was assaulted at an August 27, 2017 rally in Berkeley, California.  *Id.*

Consistent with the University's Protocols, UWPD evaluated the likely security needs for

the Patriot Prayer event and estimated that security would cost $17,000.  *Id.*  UWPD's estimate

considered the wide array of factors enumerated in the Protocols, including the event's location,

estimated number of supporters, "after action" reports provided by local law enforcement in

other jurisdictions for prior events involving Patriot Prayer, and that Gibson had been assaulted

at prior rallies and threatened with death.  *Id., ¶* 12 (describing considerations taken into account,

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 5
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

including facts revealed by UWPD's research).  UWPD also had reason to conclude that the

Proud Boys, a group known to support Patriot Prayer, may attend the event.  *Id.*  The Proud Boys

are known to carry weapons, including firearms.  *Id.*

Based on an analysis of these factors, UWPD estimated that it would need 24 officers to

provide security for a 4.5-hour period of time.  *Id.*, ¶ 13.  These 108 person-hours were then

multiplied by the UWPD's standard recharge rate of $157.52, resulting in a total estimate of

$17,012.16.  *Id.*  UWPD's analysis did not consider the political viewpoints of Gibson or the

event's host, nor did it base its estimate on past actions of groups that UWPD anticipates will

protest the event.  *Id.*, ¶ 14.

Consistent with its usual practice, the University will not charge the College Republicans

any security fee until after the conclusion of the event.  Suite Decl., ¶ 5.  The University will

permit the Freedom Rally to occur and provide appropriate security regardless of whether the

College Republicans pays the fee in advance of the event on Saturday.  *Id.*

On February 7, 2018, the College Republicans sued University officers and filed a

motion for a TRO.  Dkt. 1, 2.  In their TRO motion, the College Republicans request that the

Court order the University to grant the College Republicans a permit and furnish security for the

Patriot Prayer event.  Dkt. 2-4 ("Prop'd TRO"), ¶¶ 1, 3.  The College Republicans further request

that the Court order the University to draft interim protocols for high-risk events.  Dkt. 2-1

("Mem.") at 20.  Finally, the College Republicans request that the Court require that the

University assess a security fee for the Patriot Prayer event "only on the basis of objective

criteria," and then that the Court review this assessment at a preliminary injunction hearing after

this Saturday's event.  Prop'd TRO, ¶ 2.

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 6
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

### III. ARGUMENT

A TRO is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citation omitted).  To obtain such relief, the College Republicans must establish that:  (1) it is "likely" they will "succeed on the merits;" (2) it is "likely" they will "suffer irreparable harm in the absence of preliminary relief;" (3) the "balance of equities tips" in their favor; and (4) the requested relief is "in the public interest." *Id*. A party can also satisfy the first and third elements of the test by raising "serious questions" going to the merits of its case and a "balance of hardships that tips sharply" in its favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Because a temporary restraining order is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

The College Republicans here face a heightened standard here because they are seeking to compel the University to take the specific actions, including granting a license, furnishing security, and "crafting, at least on an interim basis, a more narrowly crafted of provisions that enable [it] to achieve any legitimate ends without unjustifiably invading First Amendment freedoms." Mem. at 20.  The requested relief is in the nature of a mandatory injunction that "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citations and quotation omitted).  A mandatory injunction is particularly disfavored because it "goes well beyond simply maintaining the status quo." *Id*.  Thus, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases . . . ." *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1980) (internal quotation omitted).  "When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 7
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

favor the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotation omitted).

Moreover, granting the College Republicans' motion will give them the full relief they seek. Courts have recognized that it is "not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial" in the context of a TRO or preliminary injunction. *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808-09 (9th Cir. 1963). "This is particularly true where the relief afforded, rather than preserving the status quo, completely changes it." *Id.*

The College Republicans cannot meet the high standard for a TRO especially considering the mandatory nature of the injunction sought.

**A.      The College Republicans Cannot Establish the Likelihood of Irreparable Harm.**

The College Republicans fail to make a clear showing of irreparable harm that is likely to result absent a TRO—"the single most important prerequisite" for the issuance of preliminary relief. *Dex Media W., Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1288 (W.D. Wash. 2011). The College Republicans' "mere assertion of First Amendment rights does not automatically require a finding of irreparable injury. It is the purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes." *CTIA-The Wireless Ass'n v. City of Berkeley, California*, 854 F.3d 1105, 1123 (9th Cir. 2017) (internal quotations omitted). [1]

Here, the University has authorized the College Republicans to host the Patriot Prayer event at the Red Square this Saturday. *See* Suite Decl., ¶ 5. The University has not taken any steps to prevent the event from going forward as planned. The UWPD and coordinating law

---

[1] The College Republicans also cannot rely on First Amendment injury as the basis for demonstrating irreparable harm because they fail to show a likelihood of success on their First Amendment claims as explained below. *See Dex Media West, Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1289 (W.D. Wash. 2011).

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 8
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

enforcement will take the appropriate measures to ensure the safety and security of the speaker, event participants, and members of the campus community. *See id.* Consistent with its regular practice, the University will not invoice the College Republicans for any security fee before the event. *Id.* No payment is required before the event. *Id.* Thus, the College Republicans do not face the loss of any speech rights absent the granting of a TRO.

At most, the College Republicans face uncertainty about the amount of security fee that it may be required to pay after the event. But there is nothing in the record showing that this uncertainty will cause the College Republicans to postpone or cancel its event. In his declaration (the only evidence submitted by the College Republicans), College Republicans' President plaintiff Chevy Swanson ("Swanson") states that the College Republicans initially "decided not to move forward" with a Patriot Prayer event at a campus facility in the fall of 2017 based on "high" anticipated security costs for an indoor talk. Dkt. 2-3, ¶ 9. But he does not indicate what those costs were, nor does he claim that the less expensive outdoor event planned for this Saturday will be postponed or called off in the absence of a TRO. *See id.*, ¶ 10. Likewise, he does not dispute the College Republicans' ability to pay the anticipated $17k security fee to cover enhanced security resources. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378-79 (5th Cir. 2008) (no irreparable harm in request to enjoin increased insurance costs because plaintiffs offered no evidence they were "unable to pay for coverage…until a judgment is rendered in this lawsuit"). The conclusory statement in the College Republicans' Memorandum (without any citation to the record) that the $17k security reimbursement would "render[] it impossible for Plaintiffs to hold its proposed rally," Mem. at 19, is not evidence of irreparable harm. *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006) ("conclusory statement from counsel hardly qualifie[s] as evidence" in support of request for TRO). Indeed, as

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 9
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

acknowledged by the College Republicans, it was able to raise the $9,000 security fee for their prior Milo Yiannopoulos event.  Dkt. 2-3, ¶ 6.

In short, the College Republicans' challenge to the amount of the security fee can be timely resolved by way of an injunction hearing with the full benefit of briefing and an evidentiary hearing if appropriate on a normal schedule.  Since the event can go on as planned and the College Republicans will not be invoiced until after the event, there is no current irreparable harm that can or should be addressed by way of a TRO.

**B.      The College Republicans Are Not Likely to Succeed on the Merits.**

   **1.  The College Republicans are not likely to succeed on their facial First Amendment challenge to the security fee.**

Rather than barring or chilling speech, the University seeks to promote and protect student groups' ability to host speakers on campus despite credible threats of disruption and violence by ensuring the safety of speakers and those who attend the events.  The only question is whether the University is barred by the First Amendment from seeking reimbursement for its reasonable security costs from the sponsor.  The answer is "no."  The First Amendment does not leave the University with the Hobson's choice of bearing all costs needed to maintain the peace at campus events or shutting down the forum altogether.

"[N]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense and Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985).  The "existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).  Courts generally consider

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 10
No. 2:18-cv-00189-MJP
   10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

government property a "limited public forum" governed by a "lenient reasonableness standard." *Cogswell v. City of Seattle*, 347 F.3d 809, 814 (9th Cir. 2003).  Strict scrutiny only applies in "traditional" and "designated" public forums (e.g., public parks, streets, and areas the government designates as public forums).  *See Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 496 (9th Cir. 2015).

In a limited public forum, speech restrictions will be upheld so long as they are (1) reasonable and (2) viewpoint neutral.  *Cornelius*, 473 U.S. at 806.  The government may "make distinctions in access on the basis of subject matter and speaker identity."  *Perry Educ. Ass'n*, 460 U.S. at 49.  Such distinctions are "inherent and inescapable" in the process of limiting "the forum to activities compatible with the intended purpose of the property."  *Id.*  Notably, the government may take into account anticipated disorderly conduct unless these concerns are a mere pretext for suppressing disfavored viewpoints.  *Seattle Mideast Awareness Campaign*, 781 F.3d at 502.

The College Republicans concede that the Red Square where they plan to host the Patriot Prayer event is a limited public forum.  Mem. at 10.  Applying the reasonableness standard, the College Republicans' facial challenge fails.  The University's recovery of enhanced security expenses from event sponsors under the Protocols is both reasonable and viewpoint neutral.

Reasonableness.  The government's restrictions on speech in a limited public forum must be reasonable "in light of the purposes of the forum and all surrounding circumstances."  *Cornelius*, 473 U.S. at 809.  Such restrictions "need not be the most reasonable or the only reasonable limitation."  *Id.* at 808.  In the context of public universities, the Supreme Court has cautioned judges against "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review."  *Christian Legal Soc. Chapter of the Univ. of Cal.,*

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1    *Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 686 (2010) (noting that "judges lack the on-

2    the-ground expertise and experience of school administrators").  Indeed, the University's

3    "mission is education, and decisions of [the Supreme] Court have never denied a university's

4    authority to impose reasonable regulations compatible with that mission upon the use of its

5    campus and facilities."  *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).

6         Requiring the host of a high-risk event to bear the cost of additional steps the University

7    needs to take to provide an adequate level of security for their event is reasonable given the

8    University's educational mission.  Because the safety and security of the campus community is

9    of paramount concern, the University must divert whatever public funds are needed to maintain

10   safety where an event poses a credible risk of disruption or violence.  Vinson Decl., ¶ 17.  Yet,

11   higher education funding is limited.  *Id*.  Every dollar that is spent on security for a campus event

12   takes away from other educational priorities.  In the end, there may be a tipping point where

13   faced with enormous security costs for campus events, public universities close limited public

14   forums on their campuses altogether, a result contrary to the objectives of all stakeholders.

15        Further, the Protocols set forth "definite and objective" procedures and standards that the

16   University must follow.  *See Seattle Mideast Awareness Campaign*, 781 F.3d at 549 (speech

17   restrictions in limited public forums "must be based on a standard that is definite and objective").

18   First, before fees can be calculated, the University must determine whether a proposed use of

19   campus facilities is likely to significantly affect campus safety, security, and operation; and, if

20   so, the appropriate conditions and restrictions for the event, including event security measures.

21   *See* Vinson Decl., ¶ 6.  The Protocols set forth criteria to be considered in this process:  the

22   University must analyze "all event factors," namely, "event details and logistics" and "known

23   histories and issues of safety and security concerns."  Suite Decl., Ex. 1.  The Protocols provide

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 12
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

representative examples, such as "history or examples of violence, bodily harm, property damage, significant disruption of campus operations, and [violation of] the campus code of conduct and state and federal law." *Id*. And the Protocols require the University to base "all determinations" on "an assessment of credible information other than the content or viewpoints anticipated to be expressed during the event." *Id.* The Protocols also enumerate potential conditions and restrictions, including additional law enforcement, imposing access controls or security checkpoints, and creating buffer zones around the venue. *Id.* These standards satisfy the reasonableness requirement.

Viewpoint neutral.  In determining viewpoint neutrality, courts ask whether government action was taken "*because of* not merely in spite of" disagreement with the speaker's viewpoint. *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) (emphasis in original). "Viewpoint discrimination is…an egregious form of content discrimination" that "occurs when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction." *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 800 (9th Cir. 2011) (ellipsis and emphasis in original; internal quotations omitted).

All of the University's actions have been motivated by safety and security concerns and the furtherance of the University's educational mission.  There is no dispute that the University's approval of applications by student groups to use campus facilities does not take into consideration the viewpoint of the campus group or the speaker. Suite Decl., ¶ 4.  Further, the Protocols prohibit the University from considering viewpoints in analyzing whether additional resources are needed for events that may significantly impact safety, security, or operations. Suite Decl., Ex. 1.  The undisputed purpose of this analysis is to make sure that sufficient resources are available to make the event safe for the campus group, the speaker, and others on

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 13
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

campus.  *Id*.  Likewise, the decision to assess a security fee and the amount of the fee are not

based on campus group or speaker viewpoints.  *Id*.  The assessment of a security fee is based on

an actual costs incurred by the University to provide necessary security and safety resources.

Suite Decl., ¶ 4.  This is consistent with the University's objective to prevent the diversion of the

enormous resources needed to maintain safety at a handful of campus events away from other

University educational priorities.  Vinson Decl., ¶ 17.

Concerns about the "heckler's veto" do not change this analysis.  The College

Republicans erroneously rely on *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133

(1992), for the proposition that any policy requiring speakers to reimburse the government for

the cost of reasonable security measures runs afoul of the First Amendment.  Mem. at 11.  The

facts in *Forsyth County* are very different than here.  There, "[t]he decision how much to charge

for police protection or administrative time—or even whether to charge at all—is left to the

whim of the administrator."  *Forsyth Cnty., Ga.*, 505 U.S. at 133.  The Court noted:

> There are no articulated standards either in the ordinance or in the county's
> established practice. The administrator is not required to rely on any objective
> factors. He need not provide any explanation for his decision, and that decision is
> unreviewable. Nothing in the law or its application prevents the official from
> encouraging some views and discouraging others through the arbitrary application
> of fees.

*Id*.  The Court appropriately concluded:  "The First Amendment prohibits the vesting of such

unbridled discretion in a government official."  *Id.*  Here, the University has an established

protocol that sets forth the factors to be considered in setting the security fee and prohibits

making view-point based decisions.  Suite Decl., Ex. 1.  UWPD officials here set forth a detailed

explanation of the basis for the estimated security fee applicable to the event.  Vinson Decl.,

¶¶ 111-4; Wilson Decl., ¶ 9.  There is no evidence supporting a claim that the University's

decision was left to the whim of a decision-maker.

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 14
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

As the Ninth Circuit has noted analyzing *Forsyth County*:  "With regard to fees in particular, there is nothing unconstitutional in a municipality's charging a fee to 'meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed.' . . . . A state may, in other words, impose a permit fee that is reasonably related to legitimate content-neutral considerations, such as the cost of administering the ordinance, the cost of public services for an event of a particular size, or the cost of special facilities required for the event."  *S. Oregon Barter Fair v. Jackson Cty., Or.*, 372 F.3d 1128, 1139 (9th Cir. 2004) (internal citations omitted).Significantly, the College Republicans fail to mention that the cases they cite about the "heckler's veto" addressed government restrictions in traditional or designated public forums subject to strict scrutiny.  *See, e.g.*, *Forsyth Cnty., Ga.*, 505 U.S. at 133. The Ninth Circuit has held that "heckler's veto" concerns "do not carry the same weight" in limited public forums like the Red Square.  *Seattle Mideast Awareness Campaign*, 781 F.3d at 502 (upholding Metro's exclusion of political ads based on reasonably foreseeable threat of disruption).  Thus, restrictions based on "anticipated disorderly conduct or violent reaction from the audience" are viewpoint neutral unless the government's asserted fears are "used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view." *Id*.  Here, the College Republicans do not dispute the University's determination that additional security measures are needed to maintain order.

For the foregoing reasons, the College Republicans fail to show likelihood of success on the merits of their facial challenge to the University's security fee.

### 2.   The College Republicans' as-applied constitutional claims fail.

The College Republicans raise as-applied claims based on free expression, retaliation, and equal protection.  Their primary argument is that the University assessed security fees in a

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 15
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

manner that discriminates against them based on their conservative viewpoint. Mem. at 15-18. They do not challenge the University's application of the Protocols in determining that the Patriot Prayer event poses a threat to public safety and the additional security measures that are required. Nor could they, given UWPD's thorough and reasoned analysis. *See, e.g.*, Vinson Decl., ¶¶ 11-14; Wilson Decl., ¶ 9.

The evidence before the Court demonstrates that the University has treated all groups the same. The University followed the same procedures for the College Republicans' Yiannopolous talk and its upcoming Patriot Prayer as all other events hosted by student groups that pose a significant threat to campus safety and security. Wilson Decl., ¶ 8-9. There is no evidence that the security fees charged for these other events deviated from objective consideration of the needs for enhanced security. The single chart relied on by the College Republicans is incomplete, and it does not demonstrate favoritism for groups with opposing viewpoints from the College Republicans. *See* Dkt. 2-3, Ex. 1.[2]

The January 2018 radio interview with UWPD Chief of Police Vinson is not evidence of discriminatory intent. Mem. at 14. Contrary to the College Republicans' contention, Chief Vinson did not agree that "security fees for left-wing speakers are much lower than for conservative speakers because left-wing speakers do not have to fear being confronted with protests by conservative agitators." Vinson Decl., ¶ 16. Chief Vinson stated, "UWPD does not categorize groups as conservative or liberal." *Id*. Although Vinson confirmed that security costs for an event featuring Shaun King with Black Lives Matter were lower than the fees charged for the College Republicans' Milo Yiannopoulos event, Vinson explained that the different security

---

[2] Even if the College Republicans could offer evidence that the University has treated similar groups differently and acted with discriminatory or retaliatory intent, their contention that the University's conduct infringes a fundamental right is incorrect. Mem. at 16. A fundamental right is not implicated in the context of a limited public forum. *See Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1141 (9th Cir. 2011). Thus, rational basis review would apply to their equal protection claim. *See id.*

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 16
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1    costs were based UWPD's evaluation of the totality of the circumstances, including any previous

2    visits of campus, what had happened across the country at other venues, the sponsor of the event,

3    the date and time of the event, and where the event was held.  *Id.*  Chief Vinson said, "Our

4    number one goal is to ensure that the environment is safe and secure for all who attend."  *Id.*[3]

5          The College Republicans also fail show that the University has acted with discriminatory

6    intent or for retaliatory or other improper purposes.  *See Vill. of Arlington Heights v. Metro.*

7    *Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (equal protection claim requires proof of

8    "discriminatory intent or purpose"); *Adams v. Small*, 542 F. App'x 567, 568 (9th Cir. 2013)

9    (unpublished) (First Amendment retaliation claim requires proof of "retaliatory motive").  The

10   record confirms that the University's motivations are ensuring security and safety and the

11   furtherance of its educational mission–not to discriminate or retaliate against the College

12   Republicans based on its political viewpoints, or those of the speakers it sponsors.  *See* Sect.

13   III.B.1, *supra.* There is no meaningful evidence to the contrary.

14         For these reasons, the College Republicans fail to meet their burden to show that they are

15   likely succeed on any of their constitutional claims.

16   **C.    The Balance of Equities and the Public Interest Favors the University's**
           **Continued Enforcement of the Protocols.**

17         Finally, both the balance of hardship and the public's interest in this action tip in favor of

18   the University, not the College Republicans.  The University has a strong public interest in safety

19   on its campus for the benefit of the campus group hosting the event, the speaker, and the broader

20   campus community.  It would not be a simple matter for the University to craft "interim"

21   protocols as proposed by the College Republicans, and doing so could very well give rise to

22   satellite litigation about whether these temporary protocols comply with the vague standards

[3] The radio interview is available online at http://mynorthwest.com/881961/uw-security-policy-unfair-conservatives/ (last visited on Feb. 8, 2018).

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 17
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

proposed by the College Republicans.  Further, the College Republicans fail to show any

hardship to them if a TRO is denied.  The University agrees that freedom of speech is an

important interest.  And the University has not prevented the College Republicans from hosting

the Patriot Prayer event on Saturday.  In fact, UWPD and coordinating law enforcement will

provide the heighted security measures needed to ensure the safety of the College Republicans'

speaker and event attendees.  Thus, the equities support denial of the TRO.

### IV. CONCLUSION

The College Republicans' motion for a TRO should be denied.  There is no exigency

requiring judicial intervention before Saturday.  The Patriot Prayer event is scheduled to go on as

planned, and the University will take the appropriate measures to ensure the campus safety and

security.  The Court should set a reasonable schedule for briefing and a hearing if necessary on

injunctive relief after the event.

DATED this 8th day of February, 2018.


PACIFICA LAW GROUP LLP


By  /s/ Paul J. Lawrence
Paul J. Lawrence, WSBA # 13557
Jamie L. Lisagor, WSBA # 39946

Attorneys for Plaintiff

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 18
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1
2
## CERTIFICATE OF SERVICE

3       I hereby certify that on this 8th day of February, 2018, I electronically filed the foregoing
4 document with the Clerk of the United States District Court using the CM/ECF system which
will send notification of such filing to all parties who are registered with the CM/ECF system.

5
6
- Kyle D Netterfield      knetterfield@elmlaw.com, cwyer@elmlaw.com
- William J. Becker, Jr      freedomxlaw@gmail.com, Bill@freedomxlaw.com

7       DATED this 8th day of February, 2018.

8                                                      PACIFICA LAW GROUP LLP

9

10                                           By  /s/ Paul J. Lawrence
                                                 Paul J. Lawrence, WSBA # 13557
11                                               Jamie L. Lisagor, WSBA # 39946

12                                           Attorneys for Defendants

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNIVERSITY OF WASHINGTON'S OPPOSITION
TO MOTION FOR TRO - 19
No. 2:18-cv-00189-MJP
10010 00124 hb08e930pg

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750