1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| COLLEGE REPUBLICANS OF THE UNIVERSITY OF WASHINGTON; CHEVY SWANSON, an individual, | CASE NO. C18-189-MJP |
|---|---|
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER |
| v. | |
| ANA MARI CAUCE, in her official capacity; GERALD J. BALDASTY, in his official capacity; RENE SINGLETON, individually and in her official capacity; CHRISTINA COOP, individually and in her official capacity; JOHN N. VINSON, individually and in his official capacity; CRAIG WILSON individually and in his official capacity; and DOES 1-25, | |
| Defendants. | |

THIS MATTER comes before the Court on Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. (Dkt. No. 2.) Having reviewed the Motion, the Response (Dkt. No. 12), and all attached declarations and exhibits, and having considered the statements of the parties at oral argument, the Court GRANTS the Motion.

**Background**

Plaintiffs University of Washington College Republicans ("College Republicans") and Chevy Swanson challenge the constitutionality of the University of Washington's ("UW") "Safety and Security Protocols for Events" policy ("Security Fee Policy"), which requires student organizations to pay the anticipated costs of security for on-campus events. (See Dkt. No. 1.) The College Republicans have organized a "Freedom Rally," scheduled to take place in Red Square on the afternoon of Saturday, February 10, 2018, and to feature Joey Gibson, the leader of the controversial, conservative political group Patriot Prayer. (Id. at 7-9.) Based upon factors including the time and location of the event, the estimated number of attendees, and the responses at prior events featuring Mr. Gibson and Patriot Prayer, the UW has determined that the Freedom Rally requires enhanced security, including the presence of additional officers from the UW Police Department. (Dkt. No. 12 at 6-7.) Pursuant to its Security Fee Policy, the UW seeks from the College Republicans an estimated $17,000 as reimbursement for its security costs. (Id.) The UW does not require that the fee be paid in advance, but will calculate and assess the total amount owed following the event. (Id. at 5.)

Plaintiffs contend that the $17,000 fee is excessive and unreasonable, and that the Security Fee Policy violates the First and Fourteenth Amendments by regulating the student organization's expression based on its conservative viewpoints and the potential reaction of those who oppose Mr. Gibson and Patriot Prayer. (Dkt. No. 2-1 at 8-9.) In particular, Plaintiffs contend that the Security Fee Policy impermissibly fails to provide any objective criteria, factors, or standards to guide administrators in estimating security costs. (Id. at 10.) Plaintiffs now move for a TRO directing the UW to assess a reasonable security fee based only on "objective criteria," not including the anticipated response of supporters or protesters. The UW has

1  indicated to the Court that it will allow the Freedom Rally to go forward, and will provide

2  security for the event. (Dkt. No. 12 at 7.) Therefore, the only issue for the Court to decide at this

3  stage is whether the $17,000 security fee is based upon "objective criteria," not including the

4  anticipated response of supporters or protesters.

## Discussion

### I. Legal Standard

A TRO is an "extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain such relief, Plaintiffs must show: (1) a strong likelihood of success on the merits, (2) a likelihood that they will suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities is in their favor, and (4) that the requested relief is in the public interest. Id. at 20. Plaintiffs seek a mandatory order compelling the UW to take specific actions (i.e., assess a reasonable security fee). Accordingly, Plaintiffs must demonstrate that without relief, "extreme or very serious damage will result" and that their injury is not "capable of compensation in damages." Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted).

### A. Likelihood of Success on the Merits

Because the UW has authorized the Freedom Rally and has agreed to take measures to ensure the safety and security of those who attend, the only question at this stage is whether the First Amendment allows the UW to seek reimbursement from the College Republicans based upon the criteria set forth in its Security Fee Policy. (Dkt. No. 12 at 9-10.) The Court finds that it does not.

Based upon the pleadings filed at this stage in the proceedings, there is no dispute that Red Square is a limited public forum. (Dkt. No. 2-1 at 10; Dkt. No. 12 at 2.) In a limited public

forum, restrictions on speech must be reasonable and viewpoint neutral. <u>Seattle Mideast Awareness Campaign v. King County</u>, 781 F.3d 489, 496 (9th Cir. 2015) (citation omitted). A reasonable restriction is one that is "based on a standard that is definite and objective." <u>Id.</u> at 499. A viewpoint neutral restriction is one that does not suppress speech "merely because public officials oppose the speaker's view." <u>Id.</u> at 502.

Plaintiffs contend that the Security Fee Policy is "vague and contains no objective criteria, factors, or standards" to guide administrators in assessing the appropriate amount of fees. (Dkt. No. 2-1 at 10.) Due to its lack of objective criteria, Plaintiffs contend that the Security Fee Policy cannot be applied in a viewpoint neutral manner. The Security Fee Policy provides in relevant part:

> When the use of campus facilities involves events, activities, and programs that are likely to significantly affect campus safety, security, and operation, the University will perform an analysis of all event factors. This could result in additional conditions and requirements placed on the host organization in order to maintain the safety and security of all organizing parties, guests attending, and the broader campus community. Safety and security concerns may include, but are not limited to, history or examples of violence, bodily harm, property damage, significant disruption of campus operations, and those actions prohibited by the campus code of conduct and state and federal law. . . .
>
> The University (i.e., venue coordinator and UWPD) may review all event details and logistics to determine necessary safety and security protocols. . . . Any determination by authorized campus officials will be based on an assessment of credible information other than the content or viewpoints anticipated to be expressed during the event. . . .
>
> The host organization or group will be required to pay costs of reasonable event security as determined in advance by the University. . . . Host organizations are financially responsible for damage, inside and outside of the venue, caused by members of their organizations or their invitees.

(Dkt. No. 13, Declaration of Denzil J. Suite at Ex. 4.)

The UW responds that the Security Fee Policy sets forth "definite and objective" procedures and standards that administrators must follow, and directs administrators to analyze "all event factors," namely "event details and logistics" and "known histories and issues of safety

and security concerns." (Dkt. No. 12 at 13.)  Further, the UW contends that because Red Square is a limited public forum, administrators may exclude speech based upon "anticipated disorderly violent reaction of the audience." (Id. at 16 (quoting Seattle Mideast Awareness Campaign, 781 F.3d at 502).)

The Court finds that the Security Fee Policy is neither reasonable nor viewpoint neutral. First, the Security Fee Policy fails to provide "narrowly drawn, reasonable and definite standards," and thereby gives administrators broad discretion to determine how much to charge student organizations for enhanced security, or whether to charge at all.  See Forsyth County v. Nationalist Movement, 505 U.S. 123, 133 (1992).  As in Forsyth, UW administrators are "not required to rely on any objective factors," and "need not provide any explanation for [their] decision[s]." Id.  Instead, administrators "must necessarily examine the content of the message that is conveyed, estimate the response of others to that content, and judge the number of police necessary to meet that response.  The fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content." Id. at 134. Apparently, the $17,000 fee assessed upon the College Republicans reflected the UW Police Department's estimate that the Freedom Rally would require 24 officers over 4.5 hours, at an hourly rate of $157.52 per officer. (Dkt. No. 12 at 7.)  While the Chief of Police offers a lengthy discussion of the "objective facts" he considered (e.g., the fact that Mr. Gibson was assaulted and pepper sprayed at recent rallies, the fact that Patriot Prayer has "members who have engaged in open carry in the past," etc.), nowhere does he explain how these facts support his determination as to the number of officers needed. (See Dkt. No. 15, Declaration of John N. Vinson at ¶¶ 12-13.)  Nor does he identify the "open-source websites" that the UW Police Department referenced to corroborate information about the event. (See Dkt. No. 14, Declaration of Craig L. Wilson at

¶ 7.) On this record, the Court cannot conclude that the estimated $17,000 fee is the product of a "definite and objective" process.

Second, the Security Fee Policy directs administrators to assess fees based upon the "history or examples of violence, bodily harm, property damage, significant disruption of campus operations" and violations of "the campus code of conduct and state and federal law." (Dkt. No. 13 at Ex. 4.) Administrators relying on instances of past protests, either for or against a student organization or speaker, will inevitably impose elevated fees for events featuring speech that is controversial or provocative and likely to draw opposition. Assessing security costs in this manner impermissibly risks suppression of "speech on only one side of a contentious debate." Seattle Mideast Awareness Campaign, 781 F.3d at 502-03.

Having found that Plaintiffs have established a likelihood of success on the merits of their First Amendment claim, the Court does not reach their remaining claims at this time.

**B. Likelihood of Irreparable Harm**

Plaintiffs have also demonstrated irreparable harm, as "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Klein v. City of San Clemente, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting Elrod v. Burns, 427 U.S. 347 (1976)). Here, it is not the amount of the fee, but rather the process by which it was assessed, that chills the exercise of First Amendment speech and expression. See Ariz. Students' Ass'n v. Ariz. Bd. of Regents, 824 F.3d 858, 867 (9th Cir. 2016) (citations omitted) (speech may be impermissibly chilled by "threatening or causing pecuniary harm" or "withholding a license, right, or benefit").

While the UW contends that it will not assess the $17,000 fee until after the rally, and that any consequences for non-payment will not be imposed for at least 60 days, whether it

intends to assess the fee days, weeks, or months later is irrelevant.  The College Republicans currently must choose whether to cancel the Freedom Rally or face the prospect of a fee. Similarly, while the UW speculates that the College Republicans will be able to pay the fee, nothing in the record supports this conclusion.  The College Republicans have indicated that they currently do not have $17,000, an amount which represents only the threshold cost of the rally. The Security Fee Policy provides that "host organizations are financially responsible for damage inside or outside of the venue caused by members of their organization or other invitees." (Dkt. No. 13 at Ex. 4.)  In addition to leaving the College Republicans uncertain as to the ultimate amount they will be charged, this provision raises certain associational concerns.  For instance, how does the UW intend to distinguish between members, invitees, and non-invitees, or to identify the cause of damage to the venue?  Finally, even assuming that the College Republicans have access to donors and other funding sources that could assist in covering their costs, other student organizations with controversial viewpoints may not be so situated.  Regardless of whether a student organization can satisfy the fee assessment, the Security Fee Policy chills protected speech, and thereby threatens irreparable harm.

### C.  Balance of Equities and Public Interest

Finally, the Court finds that the balance of equities and the public interest support entry of a TRO.  Without a TRO, Plaintiffs will be deprived of their First Amendment freedoms.  On the other hand, the UW will face no serious injustice in delaying enforcement of its Security Fee Policy pending resolution of this action on the merits.  The Court recognizes the difficult position faced by UW and other public universities across the country, many of which have recently expended millions of dollars in public funds to ensure safety and security at campus events featuring controversial or provocative speakers.  At the same time, the Court observes that

college and university campuses are where many students encounter, for the first time, viewpoints that are diverse and different from their own.  For this reason, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Healy v. James, 408 U.S. 169, 180 (1972) (citation omitted).  Allowing the UW to enforce its Security Fee Policy would infringe not only the rights of the College Republicans, but also the rights of others – including supporters and protesters – who wish to attend the Freedom Rally.  This cannot be condoned, as preventing violation of constitutional rights is "always in the public interest."  Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted).

### Conclusion

Plaintiffs have demonstrated that they are entitled to a TRO based upon their claims that the UW's Security Fee Policy violates their First Amendment rights to freedom of speech and expression.  Therefore, the Court GRANTS Plaintiffs' Motion for a TRO.  The Court further finds that protection of First Amendment rights should not be contingent upon Plaintiffs' ability to pay, and declines to order a bond.

The clerk is ordered to provide copies of this order to all counsel.

Dated February 9, 2018.

Marsha J. Pechman
United States District Judge