UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COLLEGE REPUBLICANS OF THE
UNIVERSITY OF WASHINGTON; and
CHEVY SWANSON, an Individual,

                     Plaintiffs,

v.

ANA MARI CAUCE, in her official capacity
as president of the University of Washington;
GERALD J. BALDASTY, in his official
capacity as provost and executive vice
president; RENE SINGLETON, individually
and in her official capacity as assistant director,
Student Activities; CHRISTINA COOP,
individually and in her official capacity as
senior activities advisor, Student Activities;
JOHN N. VINSON, individually and in his
official capacity as Chief of the University of
Washington, Seattle, Police Department;
CRAIG WILSON individually and in his
official capacity as University of Washington,
Seattle, Police Department Patrol Commander;
and DOES 1-25;

                     Defendants.

No. 2:18-CV-00189 MJP

UNIVERSITY OF WASHINGTON
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS ......................................................................................2

   A.    The University's Regulations and Policies Limit Use of Campus Facilities....................2

   B.    The University's Enforcement of the Protocols.........................................................5

   C.    The Patriot Prayer Event at Issue .........................................................................6

   D.    The Lawsuit ..........................................................................................................10

III.   ARGUMENT ........................................................................................................10

   A.    The College Republicans Are Not Likely to Succeed on the Merits.............................11

     1.  The College Republicans are not likely to succeed on their facial and as-applied
       First Amendment challenge to the security fee................................................................11

       a.)    Red Square is a limited public forum. .................................................................12

       b.)    The University's assessment of enhanced security fees is reasonable and
           based on definite and objective standards and criteria.......................................16

       c.)    The University's assessment of enhanced security fees in a limited public
           forum is viewpoint neutral, not an impermissible "heckler's veto." .................20

     2.  The College Republicans' other constitutional claims fail..............................................22

   B.    The College Republicans Cannot Establish Irreparable Harm and the Balance of
       Interests Favors Denial of Preliminary Injunctive Relief. ..............................................23

IV.    CONCLUSION......................................................................................................24

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - i
(Case No. 2:18-CV-00189 MJP)
   10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

# TABLE OF AUTHORITIES

**Federal Cases**

*ACLU of Nevada v. City of Las Vegas*,
  333 F.3d 1092 (9th Cir. 2003) ............................................... 15

*ACLU v. Mote*,
  423 F.3d 438 (4th Cir. 2005) ................................................ 13

*Adams v. Small*,
  542 F. App'x 567 (9th Cir. 2013) .......................................... 23

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................. 10

*Alpha Delta Chi-Delta Chapter v. Reed*,
  648 F.3d 790 (9th Cir. 2011) .............................................. 20

*Arkansas Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ......................................................... 15

*Bauer v. Becerra*,
  858 F.3d 1216 (9th Cir. 2017) ......................................... 11, 21

*Bloedorn v. Grube*,
  631 F.3d 1218 (11th Cir. 2011) ........................................... 13

*Bourgault v. Yudof*,
  316 F. Supp. 2d 411 (N.D. Tex. 2004) .................................... 15

*Bowman v. White*,
  444 F.3d 967 (8th Cir. 2006) .............................................. 14

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
  226 F. Supp. 2d 401 (S.D.N.Y. 2002) .................................... 13

*Christian Legal Soc. Chapter of the Univ. of California,
  Hastings Coll. of the Law v. Martinez*,
  561 U.S. 661 (2010) ......................................................... 14

*Cogswell v. City of Seattle*,
  347 F.3d 809 (9th Cir. 2003) .............................................. 12

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ..................................................... 16, 17

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - ii
(Case No. 2:18-CV-00189 MJP)
  10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

*Cox v. New Hampshire,*
312 U.S. 569 (1941).................................................................. 1, 11, 17, 18

*CTIA-The Wireless Ass'n v. City of Berkeley, California,*
854 F.3d 1105 (9th Cir. 2017) ............................................................ 23

*Dex Media W., Inc. v. City of Seattle,*
790 F. Supp. 2d 1276 (W.D. Wash. 2011)............................................ 23

*Flint v. Dennison,*
488 F.3d 816 (9th Cir. 2007) ............................................................... 12

*Forsyth County, Georgia. v. Nationalist Movement,*
505 U.S. 123 (1992)............................................................................. 11

*Gilles v. Blanchard,*
477 F.3d 466 (7th Cir. 2007) ............................................................... 17

*Gilles v. Garland,*
281 F. App'x 501 (6th Cir. 2008) ........................................................ 14

*Greer v. Spock,*
424 U.S. 828 (1976)............................................................................. 15

*Healy v. James,*
408 U.S. 169 (1972)....................................................................... 20, 21

*Kaplan v. County of Los Angeles,*
894 F.2d 1076 (9th Cir. 1990) ............................................................. 11

*Moss v. U.S. Secret Serv.,*
572 F.3d 962 (9th Cir. 2009) ............................................................... 20

*Murdock v. Pennsylvania,*
319 U.S. 105 (1943)............................................................................. 11

*O'Brien v. Welty,*
818 F.3d 920 (9th Cir. 2016) ............................................................... 13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983)......................................................................... 12, 13

*Pleasant Grove City, Utah v. Summum,*
555 U.S. 460 (2009)............................................................................. 13

*PMG Int'l Div. L.L.C. v. Rumsfeld,*
303 F.3d 1163 (9th Cir. 2002) ............................................................. 15

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - iii
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

*Seattle Mideast Awareness Campaign v. King County*,
    781 F.3d 489 (9th Cir. 2015) ................................................................. passim

*Shaw v. Burke*,
    No. 2:17-cv-02386-ODW (PLAx),
    2018 WL 459661 (C.D. Cal. Jan. 17, 2018) .................................... 14, 15

*Souders v. Lucero*,
    196 F.3d 1040 (9th Cir. 1999) ................................... 12, 13, 14, 20

*Southern Oregon Barter Fair v. Jackson County, Oregon*,
    372 F.3d 1128 (9th Cir. 2004) ........................................... 19, 21

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
    316 F.2d 804 (9th Cir. 1963) ........................................................ 10

*United States v. Grace*,
    461 U.S. 171 (1983) ...................................................................... 16

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................... 22

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ........................................................ 13, 14, 19

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................... 10

**Washington Statutes**

Wash. Rev. Code § 9.41.070 ................................................................. 4

Wash. Rev. Code § 28B.20.020 .............................................................. 2

Wash. Rev. Code § 28B.20.130 .............................................................. 2

**State Regulations**

Wash. Admin. Code § 478-124-020 ....................................................... 4

Wash. Admin. Code § 478-136-010 ................................................... 2, 3

Wash. Admin. Code § 478-136-015 ....................................................... 3

Wash. Admin. Code § 478-136-025 ................................................ 3, 4, 12

Wash. Admin. Code § 478-136-030 ................................................ 3, 4, 13

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - iv
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

# Other Authorities

David L. Carter, Ph.D., U.S. Dep't of Justice, Office of Community Oriented Policing Services (COPS), *Law Enforcement Intelligence: A Guide for State, Local, and Tribal Law Enforcement Agencies* (2d ed. 2009) ........................................................................ 7

Richard A. Best, Jr. & Alfred Cumming, Cong. Research Serv., RL 34270, Open Source Intelligence (OSINT): Issues for Congress (2007) ..................................................... 7

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

# I. INTRODUCTION

This case threatens the University of Washington's ability to carry out its educational mission. The University seeks to promote and protect student groups' ability to host speakers of their choosing on campus and ensure a secure and safe environment for students, faculty, and staff, without depleting the University's limited public funds. When student groups invite speakers who, through their conduct, have instigated and/or incited violence at prior events, the necessary security measures and attendant costs have proven to be significant. Fortunately, the Supreme Court has endorsed a solution: the University has authority to charge fees "to meet the expense incident to…the maintenance of public order" and to determine the amount of the fee on an event-by-event basis. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). Consistent with this precedent and pursuant to written protocols, the University provides enhanced security for higher risk events and charges student groups for the costs based on an established hourly rate.

Based on law-enforcement intelligence and careful analysis, University of Washington Police Department ("UWPD") determined enhanced security was necessary for the Freedom Rally hosted by the College Republicans on February 20, 2018 in Red Square. UWPD erected barriers to separate rally participants from counter-protestors and stationed officers at entry-points to enforce the University's weapons ban. Seattle Police Department ("SPD") provided a larger security force focused on maintaining order in and around the area with the counter-protestors. Consistent with their past conduct, Patriot Prayer supporters disregarded police orders by crossing the barriers into the area designated for counter-protestors and, as a result, fights broke out. Law enforcement arrested five people, and confiscated a knife and several items easily converted to weapons (e.g., PVC pipe, wooden sticks).

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 1
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

The College Republicans seek a preliminary injunction to prevent the University from assessing fees to pay for enhanced security at the Rally but fail to meet any of the requirements for such relief. The College Republicans are not likely to succeed on the merits of their claim that the University's assessment of security fees is unconstitutional. Red Square is a limited public forum subject to reasonable and viewpoint neutral regulations. Contrary to the College Republicans' suggestion, the University can take into account legitimate concerns about safety in regulating a limited public forum so long as the University does not favor a particular viewpoint. There is no evidence of any such favoritism. Further, the College Republicans cannot show irreparable injury or the other equitable requirements for a preliminary injunction. The University did not deny the College Republicans permission to hold the Patriot Rally. And the University has a strong public interest in maintaining safety on its campus for the benefit of the campus group hosting the event, the speaker, and the broader campus community. Accordingly, the Court should deny the College Republicans' request for a preliminary injunction.

## II. STATEMENT OF FACTS

### A. The University's Regulations and Policies Limit Use of Campus Facilities.

The University of Washington is a public university established to "provide a liberal education in literature, science, art, law, medicine, military science and such other fields as may be established…." Wash. Rev. Code § 28B.20.020. Pursuant to the broad authority granted by the Washington Legislature, Wash. Rev. Code § 28B.20.130(1), the Board of Regents adopted formal regulations governing and limiting the use of the University's facilities so that such use is consistent with the University's "broad mission of teaching, research and public service," Wash. Admin. Code § 478-136-010. Thus, the University reserves campus facilities "primarily for

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 2
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

educational use," Wash. Admin. Code § 478-136-010, with "[f]irst priority…given to regularly scheduled university activities," Wash. Admin. Code § 478-136-030(1).

While the University allows use of its facilities for a variety of activities, the University's regulations place specific limitations on these uses. *See, e.g.*, Wash. Admin. Code §§ 478-136-025 (Users), -030 (Limitations on Use). Additionally, University administration is authorized to place "reasonable time, place, and manner restrictions that take into account, among other considerations,…the direct and indirect costs to the institution;…safety concerns;…and the impact of the event on the campus community, surrounding neighborhoods, and the general public." Wash. Admin. Code § 478-136-030(1). The administration also has authority to "establish policies regarding fees and rental schedules where appropriate." Wash. Admin. Code § 478-136-015(1)(a). Pursuant to these regulations, University administration adopted written policies further limiting use of University facilities. *See, e.g.*, Dkt. 13, Ex. 1-2.

Faculty, staff, and student organizations may use facilities to hold events subject to applicable rules and policies. Wash. Admin. Code § 478-136-025(1).[1] If the general public is invited, the event must be sponsored by an academic or administrative unit and approved by the Use of University Facilities committee ("UUF") chair. *See* Wash. Admin. Code § 478-136-025(2). The Office of Student Activities often serves in this capacity for events hosted by student organizations, including the College Republicans' Yiannopoulos talk and Freedom Rally. Coop Decl., ¶ 11. A student organization hosting a speaker unaffiliated with the University is also required to get approval from the Office of Special Programs. Dkt. 13, ¶ 3, Ex. 3. The student organization submits basic information about the event, including proposed date, time, and place and biographical information about the speaker and topics to be discussed. *Id.*, Ex. 3.

---

[1] The term "student organizations" refers to Registered Student Organizations and official student governments.

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 3
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

In all cases, the University President is empowered to "prescribe, where necessary, special conditions for the conduct of particular meetings." *Id*.

Significantly, the University's regulations prohibit outside organizations and people from using University facilities to hold events unless they are sponsored by a University academic or administrative unit and the event is approved by UUF. Wash. Admin. Code § 478-136-025(3). Additional restrictions may apply based on the type of use, including private or commercial purposes; political events on ballot propositions or candidates for public office; distribution of handbills or pamphlets; and sound amplification. Wash. Admin. Code § 478-136-030. Possession of firearms and other dangerous weapons is prohibited on campus, except for authorized university purposes. Wash. Admin. Code § 478-124-020(2)(e). This prohibition applies even to a person with a concealed pistol permit. *See* Wash. Rev. Code § 9.41.070.

When an event is "likely to significantly affect campus safety, security, and operation," the University analyzes "all event details and logistics" according to policies and procedures memorialized in the Safety and Security Protocols (the "Protocols"). Dkt. 15, Ex. 1. The Protocols identify objective factors to be analyzed, including "[past] violence, bodily harm, property damage, significant disruption of campus operations," violations of the University code of conduct or state or federal laws, and other event factors (e.g., expected attendance, location, time, duration). *Id*. The Protocols expressly prohibit making determinations based on the "content or viewpoints anticipated to be expressed during the event." *Id*.

Based on its analysis, UWPD develops an appropriate security plan for the event. 2d Vinson Decl., ¶ 8. This plan may include enhanced security measures (i.e., security measures that go beyond ordinary UWPD operations) to maintain safety and security of event participants and the broader campus community. *Id.*, ¶ 5. The Protocols identify the types of measures that

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 4
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

may be appropriate, including "additional law enforcement; imposing access controls or security checkpoints . . . or [establishing] buffer zones around the venue." Dkt. 15, Ex. 1. The number of officers depends on numerous factors, including expected attendance, site characteristics (e.g., size, number of access points), event logistics, anticipated disruptive or violent conduct, and past experience. 2d Vinson Decl., ¶ 8. Although not a precise science, the determination is based on objective criteria and facts and informed by UWPD's deep expertise and experience. *Id*.

University funding to cover enhanced security provided by UWPD is limited. Dkt. 15, ¶ 17. Accordingly, the Protocols provide that a "host organization or group will be required to pay costs of reasonable event security as determined in advance by the University," which can include "security personnel, costs to secure the venue from damage, and special equipment as determined by law enforcement." *Id*., Ex. 1. The University calculates fees for UWPD officers based on standard and approved recharge rates, currently $157.52 per hour. *Id*., ¶ 13, Ex. 1.[2] The University provides hosts with an estimate of anticipated security fees during the planning process. Dkt. 17, ¶ 10. After the event, the University calculates and assesses total fees owed by the host group. *See id.*, ¶ 5. In addition to UWPD security fees, the University charges hosts for other costs, such as room and equipment rental fees. Coop Decl., ¶ 4.

### B.    The University's Enforcement of the Protocols.

Consistent with these Protocols, the University has provided heightened security for campus events that pose a substantial safety risk and then invoiced the groups for these additional security costs. The cost to UWPD of providing enhanced security has increased significantly over the past three years. 2d Vinson Decl., ¶ 6. In the first half of FY 2017-18, UWPD charged student organizations and University departments more than $1.5 million for

---

[2] For example, two officers for four hours at UWPD's current standard recharge rate of $157.52 per hour would be $1,260.16. Chief of Police Vinson sets the recharge rate annually based on the average hourly rate of UWPD officers and UWPD's associated overhead costs. 2d Vinson Decl., ¶ 6.

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 5
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

providing enhanced security. *Id.* At this pace, charges for FY 2017-18 will total approximately $3.0 million—a 36% increase from FY 2016-17 ($2.2 million) and a 100% increase from FY 2015-16 ($1.5 million). *Id.* With regard to student organizations in particular, in 2017, UWPD invoiced more than $32,000 in security fees to student organizations based on enhanced security at 12 events. Jaross Decl., ¶ 4. One such event was organized by the College Republicans in January 2017. Dkt 15, ¶ 7. The event featured self-proclaimed provocateur Milo Yiannopoulos and was open to the general public. *Id.*; Dkt. 2-3, ¶ 3. Based on then-current intel, UWPD provided an estimate of $9,120 for enhanced security costs. *See* Dkt 15, ¶ 7. The University ultimately spent about $45,000, in addition to even larger expenditures by SPD. *Id.*, ¶ 8.

Despite enhanced security by UWPD and local law enforcement, protests turned violent: one person was shot and critically injured by a Yiannopoulos supporter while many others were assaulted and wounded. Dkt. 2-3, ¶¶ 5-6; Jaross Decl., ¶ 6. After the event, the University invoiced the College Republicans $9,120. Jaross Decl., ¶¶ 5-6. The costs included security provided for Kane Hall, where the event was hosted, but not for crowds that had gathered outside of Kane Hall. *Id.* The College Republicans paid the invoice. *Id.* UWPD followed the same process for other events hosted by student organizations. *See id.*, ¶¶ 5-8; Sect. III.A.1.c, *infra*.

C.      **The Patriot Prayer Event at Issue**

In January 2018, the University learned that the College Republicans had invited Patriot Prayer for a February 10, 2018 "Freedom Rally" in Red Square, with Patriot Prayer's founder Joey Gibson as the keynote speaker. Coop Decl., ¶ 9. Consistent with the University's Protocols, after meeting with the College Republicans to get more information about the event, UWPD researched and evaluated a wide array of factors to assess potential security concerns and develop an appropriate security plan to control and ensure the safety of Gibson, event

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 6
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

participants, and members of the campus community.  *Id.*; 2d Vinson Decl., ¶ 9.  UWPD

researched past events in Seattle and the West Coast, conferred with law enforcement from these

jurisdictions, reviewed after-action reports, and monitored online "chatter" about the upcoming

Freedom Rally.  Carr Decl., ¶¶ 5-14 (detailing UWPD's research methodology and sources); 2d

Vinson Decl., ¶¶ 10-11 (describing analysis of open source information); Pentcholov Decl., ¶ 5.

UWPD's investigation process is consistent with established police investigation techniques for

assessing security issues.  Pentcholov Decl., ¶ 3; 2d Vinson Decl., ¶¶ 8, 11; Carr Decl., ¶¶ 3-4.[3]

UWPD's investigation and analysis revealed that since August 2017, at least six events

involving Patriot Prayer resulted in violence and arrests.  Carr Decl., ¶ 8.  UWPD found

considerable evidence that Patriot Prayer and its supporters, through their conduct, have a history

of intentionally inciting and escalating violence with counter-protestors, who often attend their

rallies.  *Id.*, ¶¶ 8-10.  For example, at a September 2017 rally in Vancouver, Washington, a

Patriot Prayer supporter was detained after driving his truck in reverse at high speed into a crowd

of counter-protestors.  *Id.*, ¶ 8.a (video link).  Patriot Prayer and some of its supporters (including

a group known as the "Proud Boys") are known to carry guns, pepper spray, and easily converted

weapons such as flagpoles and bats that were used in the brawls that have erupted.  *Id.*, ¶¶ 8, 10.

Reports from prior events revealed that significant law enforcement presence and separation of

participants from counter-protestors decreased the likelihood of violence; where police took a

"hands off" approach, fights ensued.  *Id.*, ¶ 9.  UWPD also noted that, in promoting the event, the

---

[3] *See, e.g.,* David L. Carter, Ph.D., U.S. Dep't of Justice, Office of Community Oriented Policing Services (COPS), *Law Enforcement Intelligence: A Guide for State, Local, and Tribal Law Enforcement Agencies*, ch. 11 (2d ed. 2009) ("In many ways, open source information holds some of the greatest value for intelligence because of the vast array of diverse, reliable information available for analysis."), *available at* https://fas.org/irp/agency/doj/lei.pdf (last visited Mar. 16, 2018); Richard A. Best, Jr. & Alfred Cumming, Cong. Research Serv., RL 34270, Open Source Intelligence (OSINT): Issues for Congress, 5-6 (2007) ("A consensus now exists that [open source information] must be systematically collected and should constitute an essential component of analytical products."), *available at* http://www.fas.org/sgp/crs/intel/RL34270.pdf (last visited Mar. 16, 2018).

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 7
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

College Republicans invoked the shooting at the Yiannopoulos talk, advertising the Freedom

Rally as their "**second shot** at making a more free UW." *Id.*, ¶ 12 (emphasis added).

In the week leading up to the event, UWPD leadership met daily to discuss the security

plan, including the number of officers, necessary equipment like barriers and lighting, and

coordination with SPD. 2d Vinson Decl., ¶ 13. The team modified the plan as appropriate based

on any new intelligence (e.g., expected attendance) and/or changes to the College Republicans'

plans (e.g., whether attendees would march through campus prior to or after Gibson's talk). *Id.*

UWPD was in contact with the FBI multiple times each day that week to confirm that the FBI's

intelligence was consistent with open source information, including the risk that Patriot Prayer

supporters might be armed. Pentcholov Decl., ¶ 5; 2d Vinson Decl., ¶ 12. UWPD's analysis did

not consider the political viewpoints of Gibson or the event's host. 2d Vinson Decl., ¶¶ 7, 11.

UWPD took responsibility for the safety and conduct of Gibson and rally participants,

while SPD did the same for the counter-protestors. *Id.*, ¶ 14. In light of this and based on the

collective experience of UWPD leadership team, UWPD decided to place barricades separating

rally participants and counter-protestors with physical barriers creating a fifteen-foot separation:



*Id.* UWPD determined where to place the barricades based on the amount of space needed to

accommodate anticipated attendance, the physical characteristics of Red Square (e.g., buildings,

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

access points, stairs), and event logistics (e.g., speaker's route to and from event).  *Id.*  Given the potential for armed participants, UWPD also stationed officers at the entrances to Red Square to enforce the University's weapon-ban.  *Id.*

As provided for under the Protocols, UWPD provided the College Republicans an estimate of enhanced security fees in advance of the event.  *Id.*, ¶ 17.  Based on then-current intelligence and analysis, UWPD estimated that it would need 24 officers to provide security protecting and controlling Gibson and rally participants for a 4.5-hour period of time and control access points to Red Square.  *Id.*  These 108 person-hours were then multiplied by the UWPD's standard recharge rate of $157.52, resulting in a total estimate of $17,012.16.  *Id.*  After providing this estimate, UWPD increased the number of necessary UWPD police officers to 30 officers based on new intelligence.  *Id.*  The number of officers took into account the length and location of the barriers, the number of access points to Red Square, and the size of the space designated for the rally participants, among other things.  *Id.*  For example, UWPD determined that it would need four to five police officers to check for weapons at the four access points.  *Id.*  In this way, the overall security plan evolved as more information was learned that in turn drives the necessary number of officers.  *Id.*  Because of the division of responsibility between UWPD and SPD, the number of UWPD officers was based on UWPD's analysis of the likely conduct of Gibson and event attendees, not the counter-protestors.  *Id.*

The Freedom Rally occurred on February 10, 2018.  *Id.*, ¶ 18.  There were 30 UWPD officers on duty, with more SPD officers handling the counter-protesters.  *Id.*  UWPD incurred about $32,000 in total expenses.  *Id.*  Several violent clashes arose between rally participants and counter-protestors.  Jaross Decl., ¶ 7.  At one point, at least three Patriot Prayer and/or Proud Boys decided to go around the barriers to confront counter protestors and a fight broke out.  2d

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 9
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

Vinson Decl., ¶ 19. The police arrested five people and confiscated multiple potentially dangerous instruments, including a box cutter, wooden sticks, and PVC pipe. *Id.* There were two reports of armed individuals at the rally but the police were unable to verify the reports. *Id.*

### D. The Lawsuit

On February 7, 2018, the College Republicans sued University officers and filed a motion for a TRO. Dkt. 1, 2. On February 9, 2018, the Court granted a TRO enjoining the University from assessing a security fee against the College Republicans. Dkt. 19.

## III. ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain injunctive relief, the College Republicans must establish each of the following: (1) it is "likely" they will "succeed on the merits;" (2) it is "likely" they will "suffer irreparable harm in the absence of preliminary relief;" (3) that the "balance of equities tips" in their favor; and (4) that the requested relief is "in the public interest." *Id*. at 20. A party can also satisfy the first and third elements of the test by raising "serious questions" going to the merits of its case and a "balance of hardships that tips sharply" in its favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Because a preliminary injunction is an "extraordinary remedy," College Republicans may only be awarded one "upon a clear showing" that they are entitled to such relief. *Winter*, 555 U.S. at 22. Further, it is "not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808-09 (9th Cir. 1963). The College Republicans cannot meet the high standard for a preliminary injunction.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

**A.      The College Republicans Are Not Likely to Succeed on the Merits.**

      **1.   The College Republicans are not likely to succeed on their facial and as-applied First Amendment challenge to the security fee.**

It is well established that the University has authority to impose fees "to meet the expense incident to…the maintenance of public order" during an event held on campus. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941); *see also Forsyth County, Georgia. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("[T]he Court has recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally…."); *cf. Bauer v. Becerra*, 858 F.3d 1216, 1226 (9th Cir. 2017), *cert. denied*, No. 17-719, 2018 WL 942466 (U.S. Feb. 20, 2018).  Further, in *Cox*, the Supreme Court held that given the "difficulty of framing a fair schedule to meet all circumstances," a government may grant its officers discretion to determine the amount of the fee on an event-by-event basis based on the public expense of policing a particular event. *Cox*, 312 U.S. at 577.  As the Court explained, affording officers "flexibility" to adjust fees "in the light of varying conditions would tend to conserve rather than impair the liberty sought." *Id.*; *see also Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943) (striking down license fee on door-to-door sales in part because the fee was "fixed in amount and unrelated to the scope of the activities of petitioners").  Where fees are based on actual costs, the government can charge more than a nominal amount. *See Forsyth*, 505 U.S. at 137; *Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1081 (9th Cir. 1990).

In light of this precedent, the College Republicans' First Amendment claim presents only two narrow issues.  First, is Red Square a limited public forum subject to reasonable, viewpoint neutral regulation?  Second, if so, are the University's policies and practices for determining

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 11
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

appropriate security measures for high-risk events and calculating the cost of any enhanced

security reasonable and viewpoint neutral?  The answer to both questions is yes.

### a.) *Red Square is a limited public forum.*

The First Amendment does not guarantee unrestricted access to campus facilities simply

because the property is owned by a public university.  *See Souders v. Lucero*, 196 F.3d 1040,

1045 (9th Cir. 1999) ("Whatever right [a member of the general public] has to be on campus

must be balanced against the right of the University to exclude him.").  Rather, the "existence of

a right of access to public property and the standard by which limitations upon such a right must

be evaluated differ depending on the character of the property at issue."  *Perry Educ. Ass'n v.*

*Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

The government creates a "limited" public forum by opening space for use only by

"certain groups or…certain topics."  *Flint v. Dennison*, 488 F.3d 816, 831 (9th Cir. 2007).  In a

limited public forum, the "lenient reasonableness standard" applies.  *Cogswell v. City of Seattle*,

347 F.3d 809, 814 (9th Cir. 2003).  Strict scrutiny only applies in "traditional" public forums

(e.g., parks and streets) and "designated" public forums (i.e., areas the government intentionally

opens to the public for "'indiscriminate use'").  *Seattle Mideast Awareness Campaign v. King*

*County* ("*SeaMAC*"), 781 F.3d 489, 496 (9th Cir. 2015) (internal quotation marks omitted).

In the TRO Order, this Court correctly held that Red Square is a limited public forum

governed by a reasonableness standard.  Dkt. 19, at 3.  Under the University's administrative

code provisions and policies, only a discrete group of people and organizations—faculty, staff,

and student organizations, as well as academic and administrative units of the University—may

host events in campus spaces like Red Square.  Wash. Admin. Code § 478-136-025; Coop Decl.,

¶ 10.  Outside groups must always have university sponsorship, and all events to which the

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 12
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

public is invited must also be sponsored by an academic or administrative unite. *Id.* Campus events are subject to further restrictions based on the type of speech (e.g., political, private and commercial, distribution of handbills). Wash. Admin. Code § 478-136-030. For an event in Red Square, the host must reserve the space, complete the UUF application process if the general public will be invited, and comply with sound amplification restrictions, among other things. Coop Decl., ¶ 10. This meets the definition of a limited public forum. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009) (limited public forum is "limited to use by certain groups or dedicated solely to the discussion of certain subjects"). In fact, courts have routinely held that by opening university facilities for only those events hosted or sponsored by members of the university community and their guests, a public university creates a limited public forum.[4]

The College Republicans now argue that Red Square is either a "traditional" public forum like a public park or, at a minimum, a "designated" public forum. Red Square is neither. First, the Ninth Circuit has acknowledged that "the outdoor space of a university [is] not a public forum" subject to strict scrutiny. *O'Brien v. Welty*, 818 F.3d 920, 931 (9th Cir. 2016) (citing *Souders v. Lucero*, 196 F.3d 1040, 1044 (9th Cir. 1999)); *see also Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (noting that a public university is not required to "make all of its facilities equally available to students and nonstudents alike, or…grant free access to all of its grounds or buildings"). Traditional public forums (the type of forum at issue in the *Forsyth* case heavily relied upon by the College Republicans) are public areas that have been devoted since time immemorial to assembly and debate. *Perry*, 460 U.S. at 45. While a public university's campus

---

[4] *See, e.g.*, *Perry*, 460 U.S. at 47 (school mail facilities opened for periodic use by civic and church organizations); *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011) (public university's sidewalks, pedestrian mall, and rotunda open only to "a discrete group of people—the [university] community; its students, faculty, and employees; and their sponsored guests"); *ACLU v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005) (university policy allowing outsiders to leaflet only in certain locations and only after reserving the space; *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 226 F. Supp. 2d 401, 418 & n.12 (S.D.N.Y. 2002) (collecting additional cases), *aff'd*, 331 F.3d 342 (2d Cir. 2003).

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 13
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

may, "for its students, possess many of the characteristics of a public forum," a campus "differs in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar*, 454 U.S. at 268 n.5. As the Supreme Court has stated, "[a] university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* This is consistent with Red Square, which is separated from the City's streets and sidewalks and, thus, cannot by its design be deemed a "quintessential" public forum.

The College Republicans contend that the University's educational mission is "irrelevant" to a forum analysis, relying on a concurrence in an out-of-circuit case. Mot. at 12-13 (quoting *Bowman v. White*, 444 F.3d 967, 985 (8th Cir. 2006) (Bye, J., concurring)). But the majority in *Bowman* disagreed, holding that because a university's "mission is education and the search for knowledge, … streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University's vast campus." 444 F.3d at 978.[5] *Bowman* is consistent with the Supreme Court's directive that "First Amendment rights…must be analyzed in light of the special characteristics of the school environment.'" *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 685-86 (2010) (internal quotation marks omitted).

The College Republicans' reliance on *Shaw v. Burke*, No. 2:17-cv-02386-ODW (PLAx), 2018 WL 459661, at *2 (C.D. Cal. Jan. 17, 2018), is similarly misplaced. *Shaw* conflicts with Ninth Circuit precedent and the "great weight of authority" in other jurisdictions holding that a university campus is not a traditional public forum. *See Souders*, 196 F.3d at 1044; *Gilles v. Garland*, 281 F. App'x 501, 511 (6th Cir. 2008) ("[G]reat weight of authority…has rejected the

---

[5] In *Bowman*, the court held the outdoor campus spaces at issue were designated public forums because, unlike here, the university's policies allowed both university and non-university entities to use the spaces. 444 F.3d at 979.

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 14
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

notion that open areas on a public university campus are traditional public fora."); *Bourgault v. Yudof*, 316 F. Supp. 2d 411, 419 (N.D. Tex. 2004) ("[N]o court has found a university's campus to be a traditional public forum."), *aff'd*, 157 Fed. App'x 700 (5th Cir. 2005). Moreover, the college in *Shaw* did "not publish its free speech rules and regulations," and, as a result, "[s]tudents...[had] no public, generally accessible means to discern any restrictions to which they are subject or under which they could be punished for engaging in speech or expressive activity on…campus." *Id*. (first alteration in original). Unlike *Shaw*, the University's regulations and policies limiting use of campus facilities are readily available. Coop Decl., ¶¶ 4-5.

Second, the University has not converted Red Square into a "designated" public forum that should be treated like a public park or street. "The defining characteristic of a designated public forum is that it's open to the same 'indiscriminate use' and 'almost unfettered access' that exist in a traditional public forum." *SeaMAC*, 781 F.3d at 496 (internal citations omitted). "The government does not create a [designated] public forum by inaction or by permitting limited discourse…." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) (internal quotation marks omitted); *see also Greer v. Spock*, 424 U.S. 828, 836 (1976) (rejecting argument that "whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum'"). Rather, "'purposeful governmental action'" with "clear intention" to create a designated public forum is required. *PMG Int'l Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1170 (9th Cir. 2002) (quoting *Forbes*, 523 U.S. at 677).[6]

The College Republicans fail to show clear intention by the University to allow indiscriminate use of, and unfettered access to, Red Square. Mot. at 13; *see also SeaMAC*, 781

---

[6] The College Republicans' reliance on *ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092 (9th Cir. 2003) to argue that the government's intention is irrelevant does not apply to the current task of determining whether a non-public forum has been turned into a designated public forum. Mot. at 11. In *Las Vegas*, the only issue was whether a street was a traditional public forum or not. *Id.* at 1102.

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 15
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

F.3d 496-97 ("To determine whether the government has imbued its property with the essential

attributes of a traditional public forum, we focus on the government's intent." (citing *Cornelius*

*v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).  The University's

regulations and policies demonstrate its intent to restrict events in Red Square to certain users

and purposes.  The University's webpage on "Outdoor Events & Reservations" cited by the

College Republicans actually confirms that outdoor events by "campus visitors" must be

sponsored "by an academic or administrative unit," approved by the UUF, and "consistent with

the University's mission of teaching, research and public service."  Lisagor Decl., Ex. 1 (noting

that hosts must reserve outdoor venues and that "Red Square…require[s] some additional

approvals").  Further, that Red Square is "popular" and accessed by the public is insufficient to

show clear intention by the University to transform the space into a designated public forum.

Mot. at 5.  "Publicly owned or operated property does not become a 'public forum' simply

because members of the public are permitted to come and go at will."  *United States v. Grace*,

461 U.S. 171, 177 (1983).

    In sum, the record does not support the argument that Red Square is a traditional or

designated public forum.  Red Square is a limited public forum subject to reasonable regulation.

    **b.)  *The University's assessment of enhanced security fees is reasonable and based on definite and objective standards and criteria.***

    The University's decision to assess fees for enhanced security at campus events strikes a

reasonable balance between the University's determination to open its campus facilities for

student organizations and others in the University community to engage in free speech and its

duty to maintain safety and security on campus.  If each of the more than 800 student

organizations hosted a single event requiring additional police presence to provide adequate

security, the expense to the University would be astronomical.  Every dollar that is spent on

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 16
(Case No. 2:18-CV-00189 MJP)
    10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

security for a campus event takes away from other educational priorities. Dividing these escalating security costs equally among all student organizations who wish to host an event—whether a lecture by a visiting scholar for 30 students or a rally open to the general public—would be unfair to some groups and tend to discourage association and speech. By contrast, the University's adjustment of fees "in the light of varying conditions would tend to conserve rather than impair the liberty sought." *Cox*, 312 U.S. at 577. In the end, there may be a tipping point where faced with enormous security costs for campus events, public universities close limited public forums on their campuses altogether, a result contrary to the objectives of all stakeholders. The University's policies are an appropriate and reasonable effort to balance the benefit of encouraging association and speech on campus and the real economic costs of allowing such association and speech. *See Cornelius*, 473 U.S. at 809 (restrictions need only be reasonable "in light of the purpose of the forum and all the surrounding circumstances"); *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) ("Since public and private universities compete with each other, courts hesitate to impose in the name of the Constitution extravagant burdens on public universities that private universities do not bear.").

The University follows objective procedures and criteria in assessing fees as set forth in the Protocols. *See SeaMAC*, 781 F.3d at 549 (speech restrictions in limited public forums "must be based on a standard that is definite and objective"). UWPD's security plan for a higher risk event drives the necessary number of additional officers and other enhanced security measures. 2d Vinson Decl., ¶ 17. For the Freedom Rally, UWPD anticipated a large number of event participants and the potential that Patriot Prayer and its supporters would carry guns or other makeshift weapons and take actions to incite violence as they had at past Patriot Prayer events. *See* 2d Vinson Decl., ¶¶ 10-13; Pentcholov Decl., ¶ 5; Carr Decl., ¶¶ 8-13, Ex. 1. Based on these

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 17
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

and other considerations, UWPD developed a security plan with SPD, creating a physical barrier between supporters and counter-protesters, with UWPD securing the Patriot Rally area and enforcing the campus weapons ban at access points to Red Square, and SPD securing the counter-protestor area. *See* Sect. II.C, *supra*. The UWPD's responsibility was to control the conduct of and protect the student-invited speakers and rally participants. *Id.* The SPD's responsibility was to control the conduct of and protect expected counter-protestors. *Id.* Because of the division of responsibility between UWPD and SPD, the number of UWPD officers was based on UWPD's analysis of the likely conduct of Gibson and attendees, not the counter-protestors. *Id.*

The University's Protocols afford far less discretion than the standard approved in *Cox.* There, the Supreme Court held that the government may afford its officers discretion to set the amount of fees "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." 312 U.S. at 577. Applying strict scrutiny (due to the nature of the forum), the Court upheld a state permitting statute that, as construed by the state supreme court, required "a reasonable fixing of the amount of the fee." *Id.* at 576-77. The state statute (unlike the Protocols) did not identify any other factors or criteria. *See id.*

The Supreme Court revisited the issue of discretion in setting event fees in *Forsyth.* Again applying strict scrutiny (due to the nature of the forum), the Court struck down an ordinance that, on its face, provided the same standard for setting the amount of fees as the state statute at issue in *Cox.* 505 U.S. at 133 n.11. The Court distinguished *Cox* based on actual evidence of a pattern of abuse by the county administrator in *Forsyth*, including that he "deliberately kept the fee low" for one group and waived the fee for others without explanation. *Id.* at 132-33; *see also Southern Oregon Barter Fair v. Jackson County, Oregon*, 372 F.3d 1128,

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 18
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1140 (9th Cir. 2004) (distinguishing *Forsyth* based on "lack [of] actual evidence of a pattern of abuse"). The Court explained that because there were "no articulated standards" in either the ordinance or the administrator's implementation, "[t]he decision how much to charge for police protection or administrative time—or even whether to charge at all—[was] left to the whim of the administrator." 505 U.S. at 133. In short, the problem in *Forsyth* was the administration of the fees at issue. *Forsyth* did not create a rule banning all fees.

Here, there is no evidence of a pattern of abuse in the University's actions indicating that the amount of security fees is left to the "whim" of University officials. As set forth in declarations, UWPD followed the same procedures for the College Republicans' Yiannopoulos talk and Freedom Rally as other events requiring enhanced security. Jaross Decl., ¶ 5. That different amounts were charged for dissimilar events is not evidence of abuse: each event posed different security risks. *See id.* For instance, unlike the College Republicans' events, the Shaun King talk was held on a Thursday night and open only to ticketed students, faculty, and staff. *Id.*, ¶ 7. UWPD's research and analysis, including consultation with the FBI, did not give UWPD reason believe that King or his supporters would carry firearms or, through their conduct, commit or incite violence on campus. *Id.* For annual events, the number of UWPD officers typically remains the same each year. *Id.*, ¶ 8. But if there is an incident, UWPD requires additional officers in subsequent years (e.g., additional officer to patrol parking lots after cars vandalized during the First Nations at UW's Spring Pow Wow). *Id.* Likewise, people with outside groups who gather informally on campus but have no association with the University are not similarly situated to student organizations that register with the University. *See Widmar*, 454 U.S. at 267 n.5 (rejecting argument that university must "make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 19
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

grounds or buildings"); *Souders*, 196 F.3d at 1044 ("'[T]he government as…school administrator may impose upon…students reasonable regulations that would be impermissible if imposed…upon all citizens.'" (quoting *Healy v. James*, 408 U.S. 169, 203 (1972) (Rehnquist, J., concurring)); Coop Decl., ¶ 5 (describing benefits and responsibilities of RSOs).

Thus, neither the University's policies nor its practices demonstrate the "unfettered" discretion that caused the Court to strike down the fee ordinance in *Forsyth*. The University's policies and practices satisfy the reasonableness requirement.

### c.) *The University's assessment of enhanced security fees in a limited public forum is viewpoint neutral, not an impermissible "heckler's veto."*

Government restrictions are viewpoint neutral unless they are implemented "*because of* not merely in spite of*" disagreement with the speaker's viewpoint. *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) (emphasis in original); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 800 (9th Cir. 2011) ("specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction" (emphasis in original)). Here, there is no evidence the University's actions were taken for any reason other than ensuring safety and carrying out its educational mission, as explained above.

The College Republicans' "heckler's veto" argument (that the University impermissibly suppresses speech based on audience reaction) fails. The University's fee assessment is based on security needed to control and protect event participants—not anticipated violent reaction of counter-protestors. In the First Amendment context, there is a "line between mere advocacy and advocacy directed to inciting or producing imminent lawless action [that is] likely to incite or produce such action." *Healy*, 408 U.S. at 188-89 (internal quotation marks omitted) (noting that university could restrict speech based on reasonable belief that student group would commit violence). This principle applies with even greater force in a university environment, where "the

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

power of the government to prohibit lawless action is not limited to acts of a criminal nature." *Id.* (internal quotation marks omitted). Public universities may restrict speech that "materially and substantially disrupt[s] the work and discipline of the school." *Id.* at 189. In determining the number of UWPD officers needed for the Freedom Rally, UWPD properly considered the history of disruption and violence caused by the conduct of Patriot Prayer and its supporters, not counter-protestors' reaction to the viewpoint being expressed. 2d Vinson Decl., ¶¶ 7, 11. SPD took responsibility for maintaining order among the counter-protestors, and these costs would not be charged to the College Republicans under the Protocols. *See id.*, ¶ 15.

Even if the University calculated security fees based in part on fear of hostile reaction by counter-protestors, this is permissible in a limited public forum like Red Square. *SeaMAC* controls. The Ninth Circuit upheld King County's refusal to display controversial ads in a limited public forum despite King County's admission that the decision was based solely on its "real and substantial" fear of hostile reaction. 781 F.3d at 502-03. The court explained that "heckler's veto" is a form of content-based discrimination and, thus, does not apply with the same force in a limited public forum, where only viewpoint neutrality is required. *Id.* at 502-03; *see also Forsyth*, 505 U.S. at 134 (applying heckler's veto doctrine in traditional public forum where regulations must be content neutral). In a limited public forum, the government has authority to restrict speech based on fear of hostile audience reaction unless the government's claimed fear is "mere pretext for suppressing expression because public officials oppose the speaker's point of view." *SeaMAC*, 781 F.3d at 502-03.[7] There is no evidence showing that the

---

[7] In *Southern Oregon Barter Fair*, cited above, the court declined to address the "heckler's veto" issue altogether because the government only assessed fees for reasonable costs of processing the permit application (not security costs). 372 F.3d at 1140. More recently, the Ninth Circuit confirmed that fees are not limited to the actual costs of processing a license and related direct administrative costs, *see Bauer*, 858 F.3d at 1226, and held that the concern regarding "heckler's veto" in Forsyth does not apply in a limited public forum like Red Square unless safety concerns are a pretext for viewpoint discrimination, *see SeaMAC*, 781 F.3d at 502.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

University's concerns were pretextual. Indeed, as the University feared, fights broke out when Patriot Prayer supporters acted in defiance of police directives. *See* 2d Vinson Decl., ¶ 17.

Contrary to the College Republicans' assertions, the University's actions were taken to maintain safety and security at campus events, not as a pretext to discriminate against the viewpoints of the College Republicans, Patriot Prayer, or any other person. Mot. at 5-6. The January 2018 radio interview of UWPD Chief of Police does not show viewpoint discrimination by the Chief, let alone the University. Mot. at 6. In the interview, the Chief confirms that UWPD does not "categorize the group[s] as conservative or liberal" and that the factors used to evaluate security needs and costs are "the same for all groups that have events on the UW campus." Dkt. 25, at 6-12. This statement is borne out by the record. *See* Sect. III.A.1.b, *supra*.

There was no viewpoint discrimination or improper heckler's veto.

### 2. The College Republicans' other constitutional claims fail.

The College Republicans raise claims based on retaliation and equal protection. Their primary argument is that the University assessed security fees in a manner that discriminates against them based on their conservative viewpoint. Mot. at 16-20. They do not challenge the University's application of the Protocols in determining that the Freedom Rally posed a threat to public safety and the additional security measures that were required. Nor could they, given the incidents incited by Patriot Prayer supporters that occurred at the Rally. 2d Vinson Decl., ¶ 19; *see also* Jaross, ¶ 9. As explained above, the evidence before the Court demonstrates that the University has treated all groups the same. *See* Sect. III.A.1.b, *supra*.

The College Republicans also fail show that the University has acted with discriminatory intent or for retaliatory or other improper purposes. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (equal protection claim requires proof of

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 22
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

"discriminatory intent or purpose"); *Adams v. Small*, 542 F. App'x 567, 568 (9th Cir. 2013) (unpublished) (First Amendment retaliation claim requires proof of "retaliatory motive"). The record confirms that the University's motivations are ensuring security and safety and the furtherance of its educational mission—not to discriminate or retaliate against the College Republicans based on their political viewpoints, or those of the speakers it invites. *See* Sect. III.A.1.c, *supra.* There is no meaningful evidence to the contrary.

For these reasons, the College Republicans fail to meet their burden to show that they are likely to succeed on any of their constitutional claims.

**B.     The College Republicans Cannot Establish Irreparable Harm and the Balance of Interests Favors Denial of Preliminary Injunctive Relief.**

The College Republicans fail to make a clear showing of irreparable harm that is likely to result absent a preliminary injunction. *See Dex Media W., Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1288 (W.D. Wash. 2011). The College Republicans' "mere assertion of First Amendment rights does not automatically require a finding of irreparable injury. It is the purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes." *CTIA-The Wireless Ass'n v. City of Berkeley, California*, 854 F.3d 1105, 1123 (9th Cir. 2017) (internal quotation marks omitted). The College Republicans hosted the Freedom Rally as planned and the University took appropriate measures to ensure the safety and security of the speaker, event participants, and members of the campus community. Although the College Republicans would be assessed security fees for the Rally per the Protocols absent an injunction, this is no different than anyone that decides to host an event and is responsible for the expenses of holding that event, including any injury or damage that occurs. *See Dex Media*, 790 F. Supp. 2d at 1288 (noting that economic injury alone does not support a finding of irreparable harm). Nothing in the record shows that the University's Protocols have prevented any student

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 23
(Case No. 2:18-CV-00189 MJP)
     10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

organization from planning future events or that the University has or is about to take disciplinary action. Any adverse consequences beyond economic injury from the University assessing the fees are speculative. A preliminary injunction would be premature at best.

Finally, both the balance of hardship and the public's interest in this action tip in favor of the University, not the College Republicans. The University agrees that freedom of speech is an important interest but it must be weighed against the University's duty to maintain safety on campus and prudently apply limited public dollars to carry out its educational mission. Thus, the equities support denial of the preliminary injunction.

## IV. CONCLUSION

The College Republicans disagree with the University's judgment about how to balance the competing priorities of promoting speech on campus and other educational priorities in spending its limited budget. The University opens its campus to a limited group of speakers and, where UWPD determines that enhanced security measures are necessary due to the anticipated conduct of speakers and event attendees, UWPD applies objective criteria for passing those costs on to the event host. There is no evidence of actual bias against or differential treatment of the College Republicans' speech. The University's actions are consistent with the First Amendment. Accordingly, the College Republicans' motion for injunctive relief should be denied.

DATED this 27th day of March, 2018.

PACIFICA LAW GROUP LLP


By /s/ Paul J. Lawrence
    Paul J. Lawrence, WSBA # 13557
    Jamie L. Lisagor, WSBA # 39946

Attorneys for Defendants

UNIVERSITY OF WASHINGTON'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 24
(Case No. 2:18-CV-00189 MJP)
10010 00124 hc279d17fp

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of March, 2018, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

DATED this 27th day of March, 2018.

_____
Dawn M. Taylor

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750